Case Nos. 99-4317/14-3718

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## DEATH PENALTY CASE

| | | |
|---|---|---|
| DANNY HILL, | : | |
| | : | On Appeal from the |
| Petitioner-Appellant, | : | United States District Court |
| | : | for the Northern District of Ohio |
| v. | : | |
| | : | District Case No. |
| TIMOTHY SHOOP, WARDEN | : | 4:96 CV 00795 |
| | : | |
| Respondent-Appellee. | : | |

---

## PETITION FOR REHEARING EN BANC
## OF RESPONDENT-APPELLEE WARDEN

---

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS*
Ohio Solicitor General
  *Counsel of Record
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
STEPHEN E. MAHER
Assistant Attorney General
30 E. Broad St., 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
bflowers@ohioattorneygeneral.gov

*Counsel for Warden Timothy Shoop*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................. ii

RULE 35(B) STATEMENT ................................................................................1

INTRODUCTION..............................................................................................1

STATEMENT ................................................................................................... 4

ARGUMENT ................................................................................................... 8

   I.    The panel misapplied §2254(d)(1), contradicting the Supreme
        Court's mandate and creating a circuit split. ........................... 8

   II.   The panel opinion misapplied, and contradicted Supreme Court
        and circuit precedent regarding, §2254(d)(2)..........................12

   III.  Improper awards of AEDPA relief are especially deserving of *en
        banc* review......................................................................... 17

CONCLUSION................................................................................................18

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Apelt v. Ryan*,
  878 F.3d 800 (9th Cir. 2017) ............................................................ 15

*Atkins v. Virginia*,
  536 U.S. 304 (2002) .................................................................. *passim*

*Black v. Bell*,
  664 F.3d 81 (6th Cir. 2011) ............................................................ 10

*Bobby v. Bies*,
  556 U.S. 825 (2009) ...................................................................... 11

*Carter v. Bogan*,
  900 F.3d 754 (6th Cir. 2018) .......................................................... 14

*Glossip v. Gross*,
  135 S. Ct. 2726 (2015) .................................................................... 4

*Harrington v. Richter*,
  562 U.S. 86 (2011) ........................................................................ 17

*Hill v. Anderson*,
  300 F.3d 679 (6th Cir. 2002) ............................................................ 4

*Hill v. Anderson*,
  881 F.3d 483 (6th Cir. 2018) ............................................................ 7

*Hill v. Anderson*,
  No. 4:96-cv-00795, 2014 U.S. Dist. LEXIS 86411 (June 25, 2014) .................... 7

*Issa v. Bradshaw*,
  910 F.3d 872 (6th Cir. 2018) .......................................................... 17

*Kernan v. Cuero*,
  138 S. Ct. 4 (2017) ...................................................................... 10

*Larry v. Branker*,
  552 F.3d 356 (4th Cir. 2009) .......................................................... 15

ii

*McMullan v. Booker*,
   761 F.3d 662 (6th Cir. 2014) .............................................................. 12

*Moore v. Texas*,
   137 S. Ct. 1039 (2017) ........................................................................7

*Moore v. Texas*,
   139 S. Ct. 666 (2019) ........................................................................ 11

*O'Neal v. Bagley*,
   743 F.3d 1010 (6th Cir. 2013) ............................................................ 14

*Ochoa v. Workman*,
   669 F.3d 1130 (10th Cir. 2012) .....................................................11, 12

*Rice v. Collins*,
   546 U.S. 333 (2006) ......................................................................... 12

*Sexton v. Beaudreaux*,
   138 S. Ct. 2555 (2018) ..................................................................... 15

*Shoop v. Hill*,
   139 S. Ct. 505 (2019) ...................................................................*passim*

*Shoop v. Issa*,
   139 S. Ct. 2616 (2019) ..................................................................... 17

*State v. Hill*,
   122 Ohio St. 3d 1502 (2009) ...............................................................6

*State v. Hill*,
   177 Ohio App. 3d 171 (11th Dist. 2008) .........................................4, 6

*State v. Lott*,
   779 N.E.2d 1011 (Ohio 2002) .............................................................4

*Van Tran v. Colson*,
   764 F.3d 594 (6th Cir. 2014) ............................................................. 16

*Williams v. Mitchell*,
   792 F.3d 606 (6th Cir. 2015) ............................................................. 10

*Wood v. Allen*,
　558 U.S. 290 (2010) ............................................. 12

**Statutes and Rules**

28 U.S.C. §2254 ...........................................*passim*

Fed. R. App. P. 35 .............................................1

**Other Authorities**

Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward
　Shift*, New York Times (April 12, 2018)............................. 18

## RULE 35(B) STATEMENT

Full-court review is necessary both to assure uniformity of Sixth Circuit law in capital habeas cases, to prevent the creation of a circuit split, and to assure faithful application of AEDPA. Fed. R. App. P. 35(b)(1)(A), (B).

## INTRODUCTION

The panel in this case awarded habeas relief to Danny Hill, a murderer. It concluded that the state court, in deeming Hill *not* intellectually disabled and thus eligible for the death penalty, contradicted "clearly established Federal law" and relied on "unreasonable" factual determinations. 28 U.S.C. §2254(d)(1), (d)(2). On these bases, the panel ordered the District Court to grant Hill habeas relief, vacating his death sentence.

If this sounds familiar, it should. Barely a year ago, the Supreme Court summarily reversed the very same panel for awarding the very same relief to the very same petitioner. *Shoop v. Hill*, 139 S. Ct. 505 (2019) (*per curiam*). The Court faulted the panel for awarding habeas relief based on alleged misapplications of decisions that post-dated Hill's state-court proceedings. It remanded, ordering the panel to "determine whether its conclusions [could] be sustained based strictly on legal rules that were clearly established in the decisions of this Court at the relevant time." *Id.* at 509.

On remand, the panel did exactly what the Supreme Court told it not to do: rather than relying on "legal rules that were clearly established" by Supreme Court decisions "at the relevant time," the panel awarded relief based on principles supposedly established by *state-court* decisions—principles that relevant Supreme Court precedent did not establish, clearly or otherwise. And the panel further erred by mischaracterizing the record and ignoring the relevant law to conclude that the state court's finding of non-intellectual-disability was factually unreasonable—never mind that the state court's finding was supported by *two experts*, one of whom was a leader in the field with thirty-eight years' experience who had *never before* testified against a defendant's intellectual disability.

If the State is forced to go to the Supreme Court, it will likely win summary reversal. But there is no way to be sure; the Supreme Court, for many reasons, sometimes fails to act. The stakes are too high to risk inaction. Most of this petition will be spent addressing the legal stakes. But before getting to that, something must be said of the human toll inflicted by the panel's persistent misapplications of habeas law.

More than thirty years ago, Danny Hill and a friend captured Raymond Fife—a twelve-year-old boy—while Fife was biking to a friend's house. They beat him. They strangled him with his own underwear and then lit it on fire, burning his

face.  They bit his genitals.  They raped him.  They sodomized him with a stick, repeatedly inserting it so violently that they ruptured internal organs.  So brutal was the torture that Raymond vomited on himself.  Then, with Raymond still alive, Hill discarded Raymond's battered and burned body in a field, where Raymond's father eventually found his son.  Raymond died two days later.

There are no words to describe the horror Raymond endured.  And for anyone with children, it is horrifying—in the literal sense of that word—even to imagine what Raymond's parents endured every day thereafter.  Walk for a minute in their shoes.  Imagine what Raymond's now-deceased father felt when he found his son's disfigured and discarded body.  Imagine what Raymond's mother experienced upon learning of the agony in which her son spent his final hours on Earth.  Now imagine having to wait decades for that small amount of solace that would come with seeing justice carried out.

The pain of delay would be legally necessary, though regrettable, if Danny Hill had any legitimate claim to AEDPA relief.  He does not.  The Fifes have endured more than any family should.  And while Hill will spend the rest of his life in prison, this Court should "not presume to tell parents whose life has been forever altered by the brutal murder of a child that life imprisonment is punishment

enough." *Glossip v. Gross*, 135 S. Ct. 2726, 2748 (2015) (Scalia, J., concurring). The full Court should intervene now. It is the least it can do.

## STATEMENT

**1.** In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment bars executing the intellectually disabled. But *Atkins* did not announce any test for determining intellectual disability. Instead, it "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction" on its execution of sentences. *Id.* at 317. In 2002, the Supreme Court of Ohio adopted a three-part test for adjudicating intellectual disability: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002).

After *Atkins*—and after Hill had already filed his first appeal challenging the denial of federal habeas relief—Hill returned to state court to raise and exhaust an *Atkins* claim. *See Hill v. Anderson*, 300 F.3d 679, 681–83 (6th Cir. 2002). There, Hill pressed his *Atkins* claim at a multi-day hearing with multiple experts under the three-part standard announced in *Lott*. Three experts are relevant here: Drs. Olley (hired by the State), Hammer (hired by Hill), and Huntsman (appointed by the court). *See State v. Hill*, 177 Ohio App. 3d 171, 178 (11th Dist. 2008).

All three experts, including Hill's own, opined that Hill malingered when they tried to test his current functioning. As one said, it was "certain" that Hill "lied about what he's able to do." R.97-1, Hear. Tr., PageID#1050; *see also id.* at PageID#264-65, 754–63, 1005–06 (This record and record 99 were filed as a CD because the CM/ECF system could not accept the file size at the time.)

The doctors disagreed, however, regarding the proper diagnosis. Dr. Hammer—a clinical professor from central Ohio, *id.* at PageID#142—deemed Hill intellectually disabled. He acknowledged the "absence of reliable" information about Hill's youth, which impeded the adaptive-behavior evaluation. *Id.* at PageID#431. Nonetheless, Dr. Hammer believed he had enough information to make the diagnosis from other records. *Id.* at PageID#172, 407, 431.

Drs. Olley and Huntsman disagreed with Dr. Hammer. Dr. Olley, a clinical professor from North Carolina with thirty-eight years of experience, had previously testified in nine *Atkins* cases. Each time, he testified *in support of* the defendant's intellectual disability. *Id.* at PageID#636, 640, 644, 726, 748. Not so here. Dr. Olley opined that Hill's IQ scores were two standard deviations below the mean. *Id.* at PageID#693, 783. Hill's adaptive functioning, however, was *not* two standard deviations below the mean, as it had to be for Hill to qualify as intellectually disabled. *Id.* at PageID#700, 783. To support his adaptive-functioning conclusion, Dr.

Olley pointed to, among other things, Hill's scores on four standardized tests of adaptive behavior, all of which were "not supportive of a diagnosis of" intellectual disability. *Id.* at PageID#700. He further observed that the tests were the only instruments from Hill's youth that "looked comprehensively at adaptive behavior." *Id.* at PageID#699. Dr. Olley also testified that Hill's "language" and "arguing on his own behalf" were "substantially more sophisticated than any of the other defendants with whom" he had worked. *Id.* at PageID#1763.

The court-appointed expert, Dr. Nancy Huntsman, agreed with Dr. Olley. Dr. Huntsman, a forensic psychologist who spent much of her professional time making diagnoses in domestic-relations and criminal cases in northeast Ohio, *id.* at PageID#959-60, concluded that Hill was not intellectually disabled because his "adaptive behavior is considerably above" the two-standard-deviation threshold. *Id.* at PageID#1049–50.

The trial court leaned heavily on these experts, calling the opinions "valuable, relevant and probative opinion testimony." R.99, PageID#3540 It ultimately sided with Drs. Olley and Huntsman, and concluded that Hill was not intellectually disabled. *Id. at* PageID#3584. The Ohio Court of Appeals affirmed the trial court's finding by a divided vote, and the Ohio Supreme Court declined review. *Hill,* 177 Ohio App. 3d at 180; *State v. Hill*, 122 Ohio St. 3d 1502 (2009).

**2.** Back again in federal court, the District Court denied Hill relief. *Hill v. Anderson*, No. 4:96-cv-00795, 2014 U.S. Dist. LEXIS 86411 *173–74 (June 25, 2014). It acknowledged that the state court's analysis cited "certain weak evidence" and had some "flawed analysis." *Id.* at *75. But it recognized that AEDPA's "standard for relief" restricted it from undoing the state court's judgment even if "a reasonable trial-court judge might have come to a different conclusion." *Id.* at *153. And here, a judge could reasonably find Hill *not* to be intellectually disabled. After all, two expert opinions (from Drs. Olley and Huntsman) supported that conclusion. *Id.* at *151.

Hill appealed and this Court reversed. The Court relied on *Moore v. Texas*, 137 S. Ct. 1039 (2017), which it said "clarified" the standards for finding intellectual disability. *Hill v. Anderson*, 881 F.3d 483, 491 (6th Cir. 2018). Ohio then sought *certiorari* and the Supreme Court summarily reversed. The Supreme Court explained that the panel erred by relying on *Moore*, which post-dated Hill's state-court proceedings. AEDPA, it explained, does not permit courts to award habeas relief based on Supreme Court decisions that did not exist at the time of the challenged state-court proceedings. *Hill*, 139 S. Ct. at 507; *see also* 28 U.S.C. §2254(d)(1). The Court vacated and remanded for the Sixth Circuit to decide

Hill's case based "strictly on legal rules that were clearly established in the decisions of this Court at the relevant time." *Id.* at 509.

**3.** After supplemental briefing and re-argument, the same panel reached the same conclusion again. The panel held that Hill is not intellectually disabled and that the state courts had committed unreasonable errors of law and fact in holding otherwise. Panel Op.7. With respect to the legal error, the panel held that "*Atkins* cannot reasonably be interpreted to permit state courts to exclude or discount past evidence of intellectual disability," which is what the panel characterized the state courts as having done. Panel Op.9. With respect to the factual errors, the panel faulted the state courts for relying on the opinions of experts who, according to the panel, failed to consider "all available evidence" and thus "lack[ed] a credible foundation" for their conclusions. Panel Op.18, 19.

The State responded by timely filing this *en banc* petition.

## ARGUMENT

The panel held that Hill was entitled to relief under 28 U.S.C. §§2254(d)(1) and (d)(2). The panel erred.

## I. The panel misapplied §2254(d)(1), contradicting the Supreme Court's mandate and creating a circuit split.

Section 2254(d)(1) permits federal courts to award habeas relief *only if* the state-court decision under review "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." The panel here awarded relief based on *state law*, and read *Atkins* to "clearly establish" a test for intellectual disability despite Supreme Court precedent to the contrary. Both errors justify *en banc* review.

**A.** When the Supreme Court reversed the panel in 2019, it ordered the Court, on remand, to evaluate Hill's *Atkins* claim "strictly on legal rules that were clearly established in the decisions of [the Supreme] Court." *Hill*, 139 S. Ct. at 509. In other words, the Supreme Court told the panel to follow §2254(d)(1).

The panel failed to do so. Instead of asking whether the state court's ruling on Hill's intellectual disability violated "clearly established *Federal* law, as determined *by the Supreme Court of the United States*," §2254(d)(1) (emphasis added), the panel awarded habeas relief based on alleged misapplications *of state law*. According to the panel, "in the *Atkins* context, 'clearly established governing law' refers to the Supreme Court decisions *and controlling state law decisions*." Panel Op.10 n.6. (citing *Williams v. Mitchell*, 792 F.3d 606, 612 (6th Cir. 2015)) (emphasis added). That reasoning disregards the plain language of §2254(d)(1), which refers only to rules clearly established by *Supreme Court* precedent. The panel's reasoning also ignores the many Supreme Court cases reminding the circuits that decisions from outside the Supreme Court do "not constitute 'clearly established Federal law, as

determined by the Supreme Court.'" *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (*per curiam*) (quoting *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (*per curiam*)); *see also Black v. Bell*, 664 F.3d 81, 108 (6th Cir. 2011) (Boggs, J., dissenting).

True, this Court held years ago that state law counts as "clearly established Federal law" in the *Atkins* context. *Williams*, 792 F.3d at 612. But that holding did not survive the Supreme Court's summary reversal in this case, which specifically ordered the panel to determine whether Hill was entitled to relief "based strictly on legal rules that were clearly established in the decisions *of this Court* at the relevant time." *Hill*, 139 S. Ct. at 509. And if *Williams* does remain good law, that is all the more reason to go *en banc* and correct course.

**B.** The panel also erred—this time creating a circuit split—by holding that "*Atkins* cannot reasonably be interpreted to permit state courts to exclude or discount past evidence of intellectual disability." Panel Op.9. According to the panel, the state court violated this (supposedly) clearly established rule by ignoring evidence from Hill's youth, and instead focusing on his abilities at the time of the *Atkins* hearing.

Assuming for the sake of argument that the state courts ignored such evidence, *but see below* 13–16, this holding contradicts Supreme Court and circuit precedent. The Supreme Court, in another case reversing this Court, explained that

*Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within" *Atkins*' compass. *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (internal quotation and alterations omitted); *see also Shoop*, 139 S. Ct. at 507. Rightly so: again, *Atkins* expressly *refused* to provide such guidance, "leav[ing] to the States the task of developing appropriate ways to enforce the constitutional restriction" upon executing the intellectually disabled. *Atkins*, 536 U.S. at 317 (internal quotation omitted). Even today, the Supreme Court's "articulation of how courts should enforce the requirements of *Atkins v. Virginia*, lack[s] clarity." *Moore v. Texas*, 139 S. Ct. 666, 672 (2019) (*per curiam*) (Roberts, C.J., concurring) (citation omitted). Because *Atkins* did not announce *any* methodology for adjudicating intellectual disability, it did not "clearly establish" that the Eighth Amendment forbids courts from "discount[ing] past evidence of intellectual disability." Panel Op.9.

In holding otherwise, the panel created a split with the Tenth Circuit. That court has properly recognized "that *Atkins* did not address the time frame, if any, at which a finding of mental retardation is relevant, i.e., time of offense, time of trial, or time of execution." *Ochoa v. Workman*, 669 F.3d 1130, 1137 (10th Cir. 2012) (internal quotation omitted). And, based on that recognition, it has held that state courts bound only by *Atkins* (rather than later intellectual-disability cases) cannot be

said to have misapplied "clearly established Federal law" by adjudicating intellectual disability based on the defendant's capacity *at the time of trial*, rather than at some earlier point in life. *Id*. at 1137. That holding is correct, and it flatly contradicts the panel's analysis.

## II. The panel opinion misapplied, and contradicted Supreme Court and circuit precedent regarding, §2254(d)(2).

The panel opinion also irretrievably conflicts with Supreme Court and Sixth Circuit precedent regarding awards of habeas relief under §2254(d)(2). That section permits federal courts to award habeas relief only when the state-court decision under review "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. This is "a daunting standard—one that will be satisfied in relatively few cases." *McMullan v. Booker*, 761 F.3d 662, 672 (6th Cir. 2014) (citation omitted). Indeed, for a petitioner to win relief, he must show that the record "compel[s]" the conclusion that the state court had "no permissible alternative" but to find in his favor. *Rice v. Collins*, 546 U.S. 333, 341 (2006). Thus, if *any* "evidence in the state-court record can fairly be read to support" the state court's "factual determination," §2254(d)(2) forbids awarding relief. *Wood v. Allen*, 558 U.S. 290, 301-302 (2010).

**A.** Instead of applying these standards, the panel repeatedly mischaracterized the record and second-guessed the state court's factfinding. The panel opin-

ion contains more such errors than it is possible to discuss in an *en banc* petition. Two examples, however, are illustrative.

*First*, the panel said the "experts … ignored evidence of adaptive deficiencies from Hill's school years, or set it aside as irrelevant to the task at hand." Panel Op.15. The experts did nothing of the sort. Dr. Olley, responding to a question about all of Hill's school-age records, acknowledged that "[m]uch of" the information in these records suggested intellectual disability, but that those records were "qualified in some ways" and did not, when viewed with all other evidence, support a disability diagnosis. R.97-1, Hear. Tr., PageID#940. Dr. Olley also acknowledged that school officials from Hill's childhood "regarded" him as disabled, but that objective tests from that period (four in all) did not "confirm[]" disability. *Id.* PageID#783. Dr. Olley also justified his discounting of anecdotal evidence from Hill's school years: "vignettes" from school records, he explained, do not make a diagnosis; only a trained eye can evaluate all the information to conclude whether a person is two standard deviations below the mean, which is what distinguishes intellectual disability from non-disabled functioning. *Id.* PageID#714. In sum, rather than ignoring evidence from Hill's youth, the experts repeatedly engaged with and evaluated it.

*Second,* the panel said the doctors "made no real attempt to reconcile" their diagnoses with past diagnoses of intellectual disability. Panel Op.20. Wrong. Dr. Olley dealt explicitly both with school-age evaluations and evaluations made for Hill's capital-murder trial. As to the former, he "acknowledge[d] that [Hill's] school personnel regarded him as a person with mental retardation and labeled him as such." R.97-1, Hear. Tr. PageID#783. But he also pointed to a great deal of evidence that led him to a different conclusion, including the anecdotal nature of the school personnel's conclusions, Hill's communicative ability under pressure, and objective tests that pointed to non-disability. *Id.*, PageID#740–41, 744, 783. As for the evaluations made for trial, Dr. Olley explained that they were "not diagnosing mental retardation per se," but were made for the purpose of capital mitigation or showing problems with *Miranda* warnings. *Id.* PageID#933–34. Thus, these evaluations were of limited relevance.

The panel's reliance on a version of the record that does not exist is a good sign something is seriously wrong with its analysis.

**B.** The panel's opinion also contradicts circuit precedent holding that state courts cannot be deemed to have made an unreasonable factual finding for purposes of §2254(d)(2) when "expert testimony [was] split." *O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013); *see Carter v. Bogan*, 900 F.3d 754, 771 (6th Cir. 2018); *see*

*also Apelt v. Ryan*, 878 F.3d 800, 837 (9th Cir. 2017) ("state court could credit one expert over another"); *Larry v. Branker*, 552 F.3d 356, 370 (4th Cir. 2009) (when state court "relied more heavily on" one expert over another, the judgment did not rest on an "unreasonable" determination of fact).  It is impossible to reconcile these cases with the panel's holding, which found that the state courts made an unreasonable finding of fact despite its finding being supported by expert testimony of the highest quality—again, Dr. Olley was a leading expert in his field, who, in all of his previous nine times serving as an expert witness in an *Atkins* hearing, had testified that he believed the defendant *was* intellectually disabled.  It is difficult to imagine a more unimpeachable witness.

The panel tried to avoid these precedents by saying that the state court should not have credited the expert testimony before it.  But in doing so, the court conducted precisely the sort of *de novo* review that §2254(d)(2) prohibits.  *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018).  In conducting credibility assessments, the panel simply substituted its own inexpert judgment for the judgment of experts.  Consider two examples.

*First*, the panel opined that "[a]necdotal evidence, such as comments and records from schoolteachers … is key to the adaptive-deficits analysis."  Panel Op.15.  The real doctors, though, said exactly the opposite.  Dr. Olley detailed why

anecdotes *are not* diagnoses.  After noting that he had reviewed notes from teachers, school psychologists, and juvenile-detention personnel, Dr. Olley said the "weakness of that [information] is that it is anecdotal … not written for the purpose of diagnosing mental retardation.  So if someone says Danny has a weakness in self help, well, is that a weakness that is two standard deviations below average?"  R.97-1, Hear. Tr. PageID#665; *see also id*. at PageID#1098.  Moreover, one of the objective measures of Hill's adaptive skills during his school years identified only one area of weakness, but noted his "strengths in self help, dressing self, general socialization, occupation and communication."  *Id*. PageID#1178.

*Second*, the panel said that neither expert who diagnosed Hill as not disabled "grappled with the extensive past evidence of Hill's intellectual disability"—a mistake the panel thought not "forgivable."  Panel Op.19.  The only unforgiveable act here is the panel's misrepresenting the record.  Both doctors testified that they evaluated Hill for disability during his youth.  R.97-1, Hear. Tr. PageID#779–83, 1051–54.  And both doctors were questioned specifically about Hill's school records.  *See id*. PageID#778–83, 1000, 1111, 1154–56.  Dr. Huntsman even called these records "incredibly important."  *Id*. PageID#1001.

Courts "strain the limits of reasonableness by rejecting expert opinions based exclusively on [their] own *inexpert* analysis."  *Van Tran v. Colson*, 764 F.3d

594, 610 (6th Cir. 2014) (emphasis added). The panel's misapplication of §2254(d)(2), if not corrected, will be used, for years to come, to justify upending state convictions and sentences based on inexpert, armchair psychology.

## III. Improper awards of AEDPA relief are especially deserving of *en banc* review.

In denying *en banc* review in the past, this Court has occasionally referred to a "recurring tension between deciding cases correctly and delegating decision-making authority to three-judge panels of the court." *Issa v. Bradshaw*, 910 F.3d 872, 873 (6th Cir. 2018) (Sutton, J., concurring in denial of *en banc* review). There is no such tension in the AEDPA context. The Supreme Court's practice of summarily reversing this Court's AEDPA decisions on a seemingly annual basis confirms that the courts have a duty to get *every* AEDPA case right *every* time. That makes sense: erroneous awards of habeas relief "intrude[] on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (internal quotation omitted). And there is no reason *this Court* should punt to the Supreme Court the duty to guard against such intrusions. The Supreme Court, for any number of reasons, sometimes fails to correct even egregiously misguided awards of habeas relief. *See, e.g.*, *Shoop v. Issa*, 139 S. Ct. 2616 (2019) (certiorari denied). As one jurist who often saw his AEDPA rulings summarily reversed is rumored to have boasted: "They can't catch 'em

all." Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward Shift*,

New York Times (April 12, 2018), online at https://www.nytimes.com/2018/04/12

/opinion/supreme-court-right-shift.html. This Court can and should.

## CONCLUSION

The full Court should rehear this case.


Respectfully submitted,

DAVE YOST
Ohio Attorney General


/s/Benjamin M. Flowers
BENJAMIN M. FLOWERS*
Ohio Solicitor General
  *Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
STEPHEN E. MAHER
Assistant Attorney General
Criminal Justice Section, Capital Crimes Unit
30 E. Broad St., 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
bflowers@ohioattorneygeneral.gov

*Counsel for Warden Timothy Shoop*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume limits and contains 3,894 words. *See* Fed. R. App. P. 35(b)(2)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

s/Benjamin M. Flowers
Benjamin M. Flowers
Ohio Solicitor General

## CERTIFICATE OF SERVICE

I certify that on May 28, 2020, a true copy of the foregoing *en banc* Petition was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Benjamin M. Flowers
Benjamin M. Flowers

# APPENDIX

## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 20, 2020

Mr. Benjamin Michael Flowers
Mr. Michael Jason Hendershot
Mr. Thomas E. Madden
Mr. Stephen E. Maher
Mr. Charles L. Wille
Office of the Attorney General of Ohio
150 E. Gay Street,16th Floor
Columbus, OH 43215

Mr. Christopher R. McDowell
Strauss Troy
150 E. Fourth Street, Fourth Floor
Cincinnati, OH 45202

Ms. Lori Beth Riga
Ms. Vicki Ruth Adams Werneke
Federal Public Defender's Office
1660 W. Second Street, Suite 750
Cleveland, OH 44113

Mr. Mark A. Vander Laan
Dinsmore
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202

Re:  Case No. 99-4317/14-3718, *Danny Hill v. Carl Anderson*
Originating Case No. : 4:96-cv-00795

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Sandy Opacich

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0159p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

Danny Hill,

                       *Petitioner-Appellant*,

      *v.*

Carl Anderson, Warden,

                   *Respondent-Appellee*.

Nos. 99-4317/14-3718

───────────────

On Remand from the Supreme Court of the United States.

United States District Court for the Northern District of Ohio at Youngstown;
No. 4:96-cv-00795—Paul R. Matia, District Judge.

Reargued: December 5, 2019

Decided and Filed: May 20, 2020

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

───────────────

## COUNSEL

**REARGUED:** Vicki Ruth Adams Werneke, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON SUPPLEMENTAL BRIEFS:** Vicki Ruth Adams Werneke, Lori B. Riga, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Michael J. Hendershot, Peter T. Reed, Stephen E. Maher, Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

## OPINION

---

**PER CURIAM.**  Danny Hill asserts in his habeas petition that the State of Ohio may not execute him because he is intellectually disabled.[1]  *See Atkins v. Virginia*, 536 U.S. 304 (2002).  *Atkins*, the case that bars the execution of intellectually disabled defendants, was decided and made retroactive after Hill was convicted of murder and sentenced to death.  Prior to *Atkins*, Hill had raised his intellectual disability as a mitigating factor in the penalty phase of his trial.  *See State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989).  Three psychological experts testified in that proceeding that Hill was intellectually disabled.  The Ohio courts agreed, stating that Hill "suffers from some mental retardation" and is "mildly to moderately retarded."  *See id.* at *6; *State v. Hill*, 595 N.E.2d 884, 901 (Ohio 1992) (discussing the experts' testimony).  But ultimately, Hill was sentenced to death because all that his intellectual disability counted for at the time was a point in his favor in the sentencing calculation—not a bar to his execution.  *See Hill*, 1989 WL 142761, at *4.  When *Atkins* came down, our court issued a remand order directing the Ohio courts to formally assess Hill's intellectual functioning under *Atkins*.  *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002).  Even though "Ohio courts reviewing his case have concluded that Danny Hill is retarded, and voluminous expert testimony supported this conclusion," we issued a remand because Hill's *Atkins* claim "ha[d] not been exhausted or conceded."  *Id.* (citations omitted).  This time around, the Ohio courts decided that Hill was *not* intellectually disabled.  *See State v. Hill*, 894 N.E.2d 108, 127 (Ohio Ct. App. 2008).

We hold that Hill is intellectually disabled and that he cannot be sentenced to death.  No person looking at this record could reasonably deny that Hill is intellectually disabled under *Atkins*.  In holding otherwise, the Ohio courts avoided giving serious consideration to past evidence of Hill's intellectual disability.  Doing so amounted to an unreasonable determination of the facts and an unreasonable application of even the general *Atkins* standard.  Accordingly,

---

[1]We will use the medical community's preferred term of "intellectually disabled" in place of "mentally retarded" except where the term is in quoted material.

we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to grant the petition and to issue the writ of habeas corpus with respect to Hill's death sentence.

In addition to his *Atkins* claim, Hill raises a claim of ineffective assistance of counsel that attacks his trial counsel's performance during his state *Atkins* hearing, a *Miranda* claim arguing that certain statements should have been suppressed during his trial, a prosecutorial-misconduct claim, and a due-process claim arguing that Hill was not competent to stand trial at the time of his convictions. For the reasons set forth below, and as explained in our prior opinion, we **AFFIRM** the district court's judgment denying Hill's habeas petition with regard to the latter three claims, and pretermit the ineffective assistance of counsel claim regarding *Atkins* because we are granting relief on the merits of the *Atkins* claim.

## I. FACTS AND PROCEDURE

The facts and legal proceedings surrounding Hill's conviction and death sentence in 1986 are set out in an earlier opinion. *See Hill*, 300 F.3d at 680–81. Because this case centers on the issue of intellectual disability, what follows is an account of the facts and proceedings relevant to that question in this case.

Several evaluations conducted around the time of Hill's trial in 1986 reveal that Hill "has a diminished mental capacity," a fact acknowledged by the state court after Hill's *Atkins* hearing. *See Hill*, 894 N.E.2d at 112 (summarizing the testimony of the three experts who testified during the mitigation phase of the initial trial that Hill was mentally "retarded"). Hill's IQ at the time of trial ranged from 55 to 68, and his moral development was "primitive"—essentially that of a two-year old. *Id*. There is no dispute that Hill's IQ is so low that he easily meets the first element of the clinical definition of intellectual disability.

Since his earliest days in school, Hill has struggled with academics. At the age of six, a school psychologist noted that Hill was "a slower learning child" and recommended that his teachers "make his work as concrete as possible" without "talking about abstract ideas." R. 97 [disc 1] (Suppl. App.) (Pages 489–91). After kindergarten, Hill was placed into special education classes for the remainder of his time in the public school system. R. 29 (Suppression

Hr'g Tr.) (Page ID #3081–92).[2]   Hill struggled to keep up academically even in his special education classes and had difficulty remembering even the simplest of instructions.  R. 31 (Mitigation Hr'g Tr. at 174) (Page ID #3486).  At the age of thirteen, his academic and social skills were at a first-grade level.  R. 97 [disc 1] (Suppl. App.) (Page 568).  At the age of fifteen, Hill could barely read or write, and he was noted to have weaknesses in self-direction and socialization, in addition to communication.  R. 31 (Mitigation Hr'g Tr. at 79) (Page ID #3391).  Those problems persist today.

Hill has also been unable to take care of his hygiene independently from a young age.  During his time in a home for children with behavioral issues, Hill could not remember to comb his hair, brush his teeth, or take a shower without daily reminders.  R. 31 (Mitigation Hr'g Tr. at 88) (Page ID #3400).[3]   Even in the highly structured environment of death row, Hill would not shower without reminders.

After receiving two convictions for rape at age seventeen, Hill was assessed for intellectual disability by the juvenile court.  R. 97 [disc 1] (Suppl. App.) (Page 527).  He was diagnosed as "mildly retarded."  *Id.*   Before *Atkins* was decided, Hill had been diagnosed as intellectually disabled approximately ten times over the course of his life.  *Id.* at 61–76, 513–530, 592–621.  During the mitigation phase of his trial for the Fife murder, the psychological experts and the Ohio courts decided that Hill was intellectually disabled and had significant adaptive deficits.  *Hill*, 1989 WL 142761, at *6; *Hill*, 595 N.E.2d at 901.  Nevertheless, the Ohio Supreme Court upheld his death sentence because it was then constitutional to execute intellectually disabled defendants.  *See Hill*, 1989 WL 142761, at *4.

The Supreme Court decided *Atkins* in 2002 while Hill's appeal from the district court's denial of his habeas petition was pending before this court.  We remanded the case to the district court with instructions to remand Hill's unexhausted *Atkins* claim to the state court and to stay the remaining claims pending resolution of the *Atkins* claim.  *Hill*, 300 F.3d at 683.  After the

---

[2]Because the pagination in the original transcript of the suppression hearing is unclear, we will cite to the pagination used by the district court.

[3]The Mitigation Hearing Transcript can be found in the district court record at R. 31 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997).

case was returned to the state court, three experts—Drs. David Hammer, J. Gregory Olley, and Nancy Huntsman—examined Hill and testified over the course of several evidentiary hearings on Hill's *Atkins* claim.  Dr. Hammer was retained by Hill, Dr. Olley acted as the state's expert, and Dr. Huntsman was appointed by the trial court.  Dr. Hammer concluded that Hill met all three prongs for a diagnosis of intellectual disability.  However, Drs. Olley and Huntsman concluded that Hill was not intellectually disabled.

The state trial court denied Hill's petition for relief under *Atkins*, finding that Hill did not exhibit significant adaptive deficits and that any deficits that he did have did not manifest before the age of 18.  *State v. Hill*, No. 85-CR-317 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3399–3482)].  The Ohio Court of Appeals affirmed that decision, over a dissent, holding in the first instance that issue preclusion did not require a different result "because the finding that he was mentally retarded was not essential to the imposition of the death penalty in the same way that it is essential in the *Atkins/Lott* context." *Hill*, 894 N.E.2d at 116, 127.  The Ohio Supreme Court declined to review the case, with two justices dissenting.  *State v. Hill*, 912 N.E.2d 107 (Ohio 2009) (table).

With the conclusion of his state-court proceedings, Hill moved to reopen and amend his habeas petition in this case to include claims under *Atkins*.  There is no dispute that Hill's IQ is so low (ranging from a low of 48 to a high of 71) that he easily meets the first element of the clinical definition of intellectual disability.  The parties disagree, however, on the propriety of the state courts' holdings that Hill did not exhibit sufficient adaptive deficits (the second element) and that Hill's deficits did not manifest themselves before he reached the age of 18 (the third element).

The district court denied Hill's amended petition in a thorough opinion, holding that the deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) mandated denial of Hill's habeas petition.  *Hill v. Anderson*, No. 4:96-cv-00795, 2014 WL 2890416, at *51 (N.D. Ohio June 25, 2014).  It did so despite its serious misgivings about the state court's rejection of the extensive record evidence that provided important diagnostic information regarding Hill's adaptive functioning and the age of onset of Hill's intellectual disability.  *Id.*  Ultimately, the district court believed that AEDPA required acceptance of the

state court's determinations that Hill did not exhibit sufficient adaptive deficits and that Hill's disability did not manifest before the age of 18.

We disagreed and held that "[t]he district court was right to be skeptical of the state court judgment because it amounted to an unreasonable application of the standard articulated by the Supreme Court in *Atkins* and as later explained by *Hall* and *Moore*." *Hill v. Anderson*, 881 F.3d 483, 489 (6th Cir. 2018) (citing *Moore v. Texas*, 137 S. Ct. 1039 (2017); *Hall v. Florida*, 572 U.S. 701 (2014)). "Specifically," we held, "the state court's determination was unreasonable in two ways: First, the state court departed from the requirements of *Atkins* when it disregarded well-established clinical standards for assessing adaptive deficits by focusing on Hill's adaptive strengths instead of his adaptive deficits. Second, the trial court ignored clear and convincing evidence that Hill exhibited substantial deficits in both his intellectual and adaptive abilities since long before he turned 18." *Id.* However, the Supreme Court decided that we relied too heavily on its more recent precedent in reaching that decision and remanded the case back to us to analyze Hill's *Atkins* claim based solely on Supreme Court precedent that was clearly established at the time, as required under 28 U.S.C. § 2254(d). *See Shoop v. Hill*, 139 S. Ct. 504 (2019); *see also Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) (Under AEDPA, "[t]he law in question must have been clearly established at the time the state-court decision became final, not after.").

Thus, the issue before us on remand from the Supreme Court is whether it was unreasonable for the Ohio courts to decide that Hill did not exhibit significant adaptive deficits. The Court has instructed us on remand to "determine whether [our] conclusions can be sustained based strictly on legal rules that were clearly established in the decisions of [the Supreme Court] at the relevant time." *Hill*, 139 S. Ct. at 509.[4] The relevant date here is that of the Ohio Court of Appeals's decision in 2008.

---

[4]We also previously held that the Ohio courts made an unreasonable determination of fact as to age of onset. *See Hill*, 881 F.3d at 501. The Supreme Court took no issue with this holding, so we will rest on our prior reasoning with respect to this element, which is repeated here for the sake of completeness. For the same reason, we stand by our decision to affirm the district court's judgment denying Hill's habeas petition with regard to his ineffective-assistance-of-counsel, suppression, and prosecutorial-misconduct claims, and pretermitting the ineffective-assistance-of-counsel claim regarding *Atkins*. *See Hill*, 881 F.3d at 487. We will repeat our analysis here as well merely for the sake of completeness.

## II.  STANDARD OF REVIEW

The parties dispute the proper standard of review for Hill's *Atkins* claim.  Hill argues that we should review the state courts' determinations on adaptive deficits and age of onset as both legal and factual conclusions under 28 U.S.C. § 2254(d)(1) and (2).  That would mean that we ask whether, under § 2254(d)(1), those decisions amount to an unreasonable application of *Atkins* and whether, under §§ 2254(d)(2) and 2254(e)(1), there is clear and convincing evidence that the state courts' findings amounted to an unreasonable determination of the facts.  The Warden argues that we should review the state courts' determinations only as findings of fact under § 2254(d)(2).  In its view, Hill's argument is substantively a factual argument, and if Hill intended to present § 2254(d)(1) arguments, he should have made them in his supplemental briefing filed after the remand.

We agree with Hill that the state courts' determination on adaptive deficits should be analyzed as both legal and factual conclusions under § 2254(d)(1) and (2).  Hill's arguments attack the reliability of the state courts' determination of the facts and their interpretation of *Atkins*.  But, at the same time, his case partly turns on what a court must consider under *Atkins* in testing for intellectual disability, which we have recognized is a question of law.  Moreover, Hill presented a § 2254(d)(1) argument in his opening brief, and we issued our prior decision, with respect to adaptive deficits, based on § 2254(d)(1).  (*See* Hill Opening Br. at 34 ("The state courts' application of the law and the determination of the facts were unreasonable, and therefore habeas relief is warranted under 28 U.S.C. § 2254(d)(1) and (2).")).  Hill's strategic decision to focus on § 2254(d)(2) in his supplemental brief upon remand does not waive the prior arguments raised in his opening brief.  Lastly, the Supreme Court instructed us on remand to "determine whether [our] conclusions can be sustained based strictly on legal rules that were clearly established in the decisions of [the Supreme Court] at the relevant time."  *Hill*, 139 S. Ct. at 509.  We accordingly will analyze Hill's adaptive-deficits argument under both § 2254(d)(1) and (2), keeping in mind that Hill's arguments draw heavily on the facts.  As we did in our prior opinion, we will analyze the state court's conclusion on the age-of-onset prong solely as a finding of fact under § 2254(d)(2).

Under § 2254(d)(1), we must decide whether the state courts' conclusion that Hill did not exhibit significant adaptive limitations was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254(d)(1) applies when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000). Under § 2254(d)(2), our review is limited to the question of whether the state court's findings amount to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In making that assessment, we are mindful that AEDPA directs us to presume that facts decided by the state court are correct absent "clear and convincing evidence" to the contrary. § 2254(e)(1).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

## III. *ATKINS* CLAIM

The Supreme Court held in *Atkins* that the Eighth Amendment prohibits the execution of intellectually disabled individuals. 536 U.S. at 314–17. Although it ultimately left the development of the test for intellectual disability up to the states, *id.* at 317, the Supreme Court noted that two diagnostic manuals of the psychiatric profession require three separate findings before a diagnosis of intellectual disability is appropriate.[5] *Atkins*, 536 U.S. at 308 & n.3. Those findings are: (1) "significantly subaverage intellectual functioning;"—typically indicated by an IQ level at or below 70; (2) "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety;" and (3) manifestation or onset before the age of 18. *Id.* at 308 n.3.

---

[5]Prior to 2007, the American Association on Intellectual and Developmental Disabilities (AAIDD) was known as the American Association on Mental Retardation (AAMR).

Ohio adopted the three-prong standard set forth in *Atkins* for evaluating a claim of intellectual disability in *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002).  The Supreme Court of Ohio specifically approved the definition of intellectual disability set forth in the then-current editions of the diagnostic manuals.  *Id.* at 1014.  Applying the standards in those manuals, individuals had significant limitations in adaptive skills if they exhibited deficits in at least two of the skill areas set out in *Atkins*.  *Id.*

## A. Adaptive Deficits

Hill disputes the Ohio court's finding that he did not exhibit significant adaptive limitations, emphasizing that he has been diagnosed as intellectually disabled and lacking in adaptive skills from a young age.  We agree and find that Hill has exhibited significant adaptive limitations since childhood and cannot justifiably be executed even under the general *Atkins* standard.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("[E]ven a general standard may be applied in an unreasonable manner.").

A state court decision is not entitled to AEDPA deference when "the factfinding procedures upon which the [state] court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'"  *Id.* at 954 (quoting *Ford v. Wainwright*, 477 U.S. 399, 423–24 (1986) (Powell, J., concurring in part and concurring in the judgment)).  Here, the state trial court ruled that the focus of the evaluation would be Hill's present functioning, and therefore that contemporary evidence was what was primarily relevant—not historical accounts.  The Ohio courts failed seriously to contend with the extensive past evidence of Hill's intellectual disability. *Atkins* cannot reasonably be interpreted to permit state courts to exclude or discount past evidence of intellectual disability.  And the Ohio courts' cafeteria-style selection of some evidence from Hill's behavior in the law-enforcement context, over evidence from his special education classes, resulted in an unreasonable determination of the facts.

The Supreme Court stated in *Atkins* that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also *significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.*"

536 U.S. at 318 (emphasis added). Accordingly, in *Williams v. Mitchell*, we held that the "refusal to consider past evidence of intellectual disability in determining whether [the petitioner] has significantly subaverage mental functioning and adaptive skills limitations is directly contrary to the clearly established governing law set forth in *Atkins/Lott*." 792 F.3d 606, 617 (6th Cir. 2015). "[T]he clinical definitions cited with approval by *Atkins* and adopted by *Lott* do not treat present functioning and early onset as unrelated parts of a disconnected three-part test." *Id.* at 619. Intellectual disability must manifest before age eighteen. *Id.* Based on a "plain reading" of the *Atkins* standard as explained by *Lott*, "past evidence of intellectual disability—including evidence of intellectual disability from an individual's childhood—is relevant to an analysis of an individual's present intellectual functioning." *Id.* And, "because intellectual disability manifests itself during childhood and remains static throughout life, evidence of intellectual disability from one point in life is relevant to an examination of intellectual disability in another." *Id.* (citing *State v. White*, 885 N.E.2d 905 (Ohio 2008)).

We also noted in *Williams* that, prior to *Atkins*, the Supreme Court had recognized that past evidence of intellectual disability is relevant to present or future functioning. *See Williams*, 792 F.3d at 620 (citing *Heller v. Doe*, 509 U.S. 312, 321–23 (1993)). In *Heller*, the Supreme Court held that committing people with intellectual disabilities based on clear and convincing evidence of future dangerousness was constitutional because intellectual disability manifests during childhood and "is a permanent, relatively static condition, so a determination of dangerousness may be made with some accuracy based on previous behavior." 509 U.S. at 321–23 (citation omitted). "Thus, 'almost by definition in the case of the retarded [adult] there is an 18-year record upon which to rely' when assessing the individual's *future intellectual functioning*." *Williams*, 792 F.3d at 620 (alteration in original) (quoting *Heller*, 509 U.S. at 323).

All of this was clear to the Ohio courts in 2008.[6] *See id.* at 619 (citing *White*, 885 N.E.2d 905). In *White*, the Ohio Supreme Court held that it was an abuse of discretion to dismiss the

---

[6]To the extent that the Ohio Supreme Court applied *Atkins* in decisions that were available at the time, we will also apply that precedent. *See Williams*, 792 F.3d at 612 ("[I]n the *Atkins* context, 'clearly established governing law' refers to the Supreme Court decisions *and* controlling state law decisions applying *Atkins*." (emphasis added)). We do so because *Atkins* left it to the states to refine the test for intellectual disability. *Id.* (citing *Black v. Bell*, 664 F.3d 81, 92 (6th Cir. 2011); *Van Tran v. Colson,* 764 F.3d 594, 617–19 (6th Cir. 2014)).

psychological experts' opinions based on White's school records as "conjectural." 885 N.E.2d at 916. "Although White had taken neither an IQ test nor an adaptive-skills test before age 18," his school "records strongly support[ed] the experts' conclusion that White's intellectual and adaptive deficits had their onset before age 18." *Id.* School records are relevant because, as both experts in *White* explained, "a person's mental-retardation status does not change over his lifetime. Hence, if an adult is found to have intellectual and adaptive deficits not caused by a brain injury or illness, it can be inferred that those deficits have existed since childhood." *Id.* at 917. "[T]he trial court, by rejecting well-supported expert opinion regarding *pre-18 onset* without any evidence to the contrary, abused its discretion." *Id.* (emphasis added).

In Hill's case, the Ohio Court of Appeals correctly set forth the three-prong *Atkins* standard as adopted by the Ohio Supreme Court in *Lott*. It also correctly noted that the second criterion under *Lott* requires the defendant to demonstrate "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction." *Hill*, 894 N.E.2d at 113. Then it veered off track. Focusing mostly on Hill's interactions with law enforcement, prison officials, and the courts, the Ohio courts discounted extensive past evidence of intellectual disability—including multiple diagnoses of intellectual disability, and numerous comments on Hill's adaptive deficiencies made while Hill was in school. The two experts who concluded that Hill did not exhibit significant adaptive deficits did the same. In the few instances where the Ohio courts did confront Hill's school records, they misrepresented the contents. These errors amount to an unreasonable application of *Atkins/Lott* and an unreasonable finding of fact.

### 1. Significant Limitations

The history of Hill's diagnoses and adaptive limitations was given short shrift in the Ohio courts. According to the Ohio courts, the anecdotal evidence in the record "constituted a 'thin reed' on which to make conclusions about Hill's diagnosis." *Hill*, 894 N.E.2d at 124. Yet, as the district court noted, "the state-court record was hardly a 'thin reed.' At well over 6,000 pages, it was voluminous." *Hill*, No. 4:96-cv-00795, 2014 WL 2890416, at *24. "[T]he true 'thin reed' in this case was the information that was available concerning Hill's adaptive functioning at the time he filed his *Atkins* claim," which for whatever reason, was "the focus of the evaluation." *Id.*

Of the criteria for adaptive deficits set out in *Lott*, it is clear from the record that Hill displayed significant limitations, at the very least, in functional academics, hygiene/self-care, social skills, and self-direction. With respect to functional academics, Hill was considered "mentally retarded" by the Warren City Schools. He was diagnosed as mildly mentally retarded, "trainable mentally retarded," or "educable mentally retarded" several times before he turned eighteen, beginning with the recognition that he was a "slower learning child" when he began formal schooling at age six. *See* R. 97 [disc 1] (Suppl. App.) (Pages 489–91). He scored 70 or below on every IQ test administered during his school years. *Id.* at 489–94, 511–19. He attended special education classes for the entirety of his school career. R. 29 (Suppression Hr'g Tr.) (Page ID #3081–92).[7]

At age six, Hill did not know his age, but thought he was nine. R. 97 [disc 1] (Suppl. App.) (Pages 489). His visual-motor coordination was at the three-year-old level, his reading and verbal skills were at the five-year-old level, and he had a mental age of four years and six months. *Id.* at 490. At age 8 years and 8 months, Hill was considered functioning at a "mid-kindergarten to beginning first grade level." *Id.* at 493. At age thirteen, he was functioning at the "mid-2nd grade level" in reading and the "mid-1st grade level" in arithmetic. *Id.* at 515. His psychologist noted that his learning abilities "ha[d] fallen 22 points" in the last five years, and that his relative weaknesses lie "in not being able to recall everyday information, do abstract thinking, perform mental arithmetic, perceive a total social situation, [and] perceive patterns." *Id.* At the same age, he was sent to a school for intellectually disabled children to continue his special education. *See* R. 97 [disc 1] (Suppl. App.) (Pages 513–19). A school psychologist set out instructional goals that included teaching Hill his address and phone number, as well as how to tell time. *Id.* at 578. He exhibited weaknesses in reasoning ability, originality, verbal interaction, and a lack of intellectual independence.

By age fourteen, Hill was reading at a first-grade level and his math skills were at a third-grade level. He still had not mastered writing his own signature. *Id.* His teacher was working

---

[7]Hill was "mainstreamed" only in physical education and music, and struggled even there to keep up with and socialize normally with his peer group. R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 246–48). There is no record of him taking "mainstream" classes in any academic subject area, i.e., math, reading, or history. *See id.*

on self-control skills that should generally be mastered by a kindergarten student, including "working without being disruptive" and not touching other students inappropriately. Teachers set academic objectives like learning to: tell time in five-minute intervals; write his own signature; shower regularly; put soiled clothing in the appropriate place; and eat and drink in a manner appropriate in a school setting. Hill was described as hyperactive and needing to complete tasks "one step at a time."

Hill was transferred to another, similar school at fifteen because of poor academic achievement and behavior. R. 31 (Mitigation Hr'g Tr. at 77) (Page ID #3389). At seventeen years old, after being arrested for, and pleading guilty to, two felony rape charges, the juvenile court placed Hill in a facility that housed youth offenders with mental disabilities or emotional problems. *Id.* at 120–23 (Page ID #3432–35). There, Hill completed ninth grade in special education classes at age eighteen. *Id.* at 81–82 (Page ID #3393–94). He was at the second- or third-grade reading level. *Id.* After being released, he returned to high school, but Fife's murder occurred six months later.

The record also demonstrates that Hill was deficient in hygiene and self-care. At the age of fourteen, he still needed to be told to shower regularly, brush his teeth, and apply deodorant every day. He would not independently follow through and take care of his hygiene unless he was told to do so. At approximately age sixteen, a group home officer noted that although Hill was "improving in his personal hygiene," he still "need[ed] constant reminder[s] to shower, brush his teeth, etc.[.]" Hill continued to have problems with his hygiene in prison and had to be reminded frequently to groom himself.

The record also demonstrates that Hill had limitations in the area of social skills. For example, the district court pointed to the testimony of psychologists who spoke to Hill's "poor self-esteem, inability to interpret social situations and create positive relationships, and [the fact] that he was easily influenced by people, gravitated toward an antisocial peer group, and did not respond appropriately to authority figures." *Hill*, 2014 WL 2890416, at *38. Hill's school and court records demonstrate that he had trouble making friends. At seventeen, Hill was described as "socially constricted" and possessing "very few interpersonal coping skills."

Hill also showed limitations in at least one more area—self-direction.  Hill was described as "easily led" in both his school and court records, and from periods both before and after he committed serious crimes while apparently acting alone.  In school, Hill was described as immature and "easily led by others into trouble around school," like fighting.  He was vulnerable to exploitation by older individuals, displayed inappropriate and immature behaviors in class, rarely considered the consequences before acting, and had trouble conforming his behavior to the rules or the law.  When Hill was thirteen, he was described as exhibiting a "great deal of impulsivity."  When Hill was seventeen, he was evaluated by a psychologist who concluded that he had poor judgment, "d[id] not think of consequences," was "highly suggestable," and "was 'likely to be exploited'" if placed in halfway home for adults "because of his 'passivity and limited intellectual ability.'"  Another report from that same time expressed concern about his tendency to follow others.  Even when he was in prison at age twenty-one, a correctional officer reported that Hill was easily led by other inmates and had to be told how to do his job at every step of the way.  *See* R. 97 [disc 1] (*Atkins* Hr'g Tr.) (Page 437–39).

In addition to his significant limitations in functional academics, self-care, social skills, and self-direction, the record also demonstrates that Hill never has lived independently, never had a driver's license or a bank account, never has been able to perform a job without substantial guidance from supervisors, was labeled "functionally illiterate" at school and in prison, could never read or write above a third-grade level, and could never adequately sign his own name.

Even if Hill appeared to be functioning at an average skill level to a lay person's eyes, it is common for someone with mild intellectual disability to present as functioning.  *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 189).  That is why the impressions of schoolteachers are critical—because children often are not diagnosed "until they get to school and teachers who are familiar with kids at various cognitive abilities discover that this child is, No. 1, not where they should be for their age in terms of their current [intellectual] functioning . . . .  And, two, that as they try to teach them they learn at a much slower rate."  *Id.*  Comments from Hill's schoolteachers were largely left unaddressed—or were distorted—in the Ohio courts' analysis.

## 2. Unreliable Experts

Nevertheless, it might seem that the Ohio courts rendered a reasonable decision because they relied on the opinions of two psychological experts who found that Hill did not exhibit significant adaptive deficits. According to the Ohio Court of Appeals, the experts and the record provided "competent and credible evidence to support the trial court's conclusion that Hill does not meet the second criterion for mental retardation." *Hill*, 894 N.E.2d at 126. But both experts, at the trial court's direction, ignored evidence of adaptive deficiencies from Hill's school years, or set it aside as irrelevant to the task at hand. Anecdotal evidence, such as comments and records from schoolteachers and others who have interacted with or evaluated the subject, is key to the adaptive-deficits analysis. *See Hill*, 894 N.E.2d at 124–25 (discussing anecdotal evidence); R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 383–84) (stating that the psychological profession values "collateral information"); R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 696) (stating the importance of "drawing information from many different sources of functioning in every day life under every day circumstances").

Two experts testified in Hill's *Atkins* proceedings that Hill did not display significant adaptive limitations. *State v. Hill*, No. 85-CR-317, at 79–80 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3477–78)]. The state trial court relied upon their opinions to conclude that Hill had failed to demonstrate significant adaptive deficits. *Id.* at 81.[8] All three experts, including Dr. Hammer (Hill's expert), found that Hill malingered or tried to "fake bad" on the adaptive skills tests given to him in 2004. *State v. Hill*, No. 85-CR-317, at 53 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3451, 3479)]. Drs. Olley (the state's expert) and Huntsman (the trial court's expert) heavily weighed the fact that Hill malingered in coming to their decision that Hill

---

[8]We have previously denied *Atkins* relief in an AEDPA case arising out of Ohio where, as here, two of the three mental-health experts testified that the petitioner was not intellectually disabled. *O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013) ("With expert testimony split, as it often is, the state court chose to credit Dr. Chiappone and Dr. Nelson over Dr. Tureen, and we cannot say from this vantage that it was unreasonable to do so."). However, *O'Neal* is distinguishable on its facts, and Hill's claim for *Atkins* relief is much stronger than the petitioner's claim in *O'Neal*. For example, in *O'Neal* there was insufficient evidence to prove that the petitioner met the first prong in demonstrating "significantly subaverage intellectual functioning." *Id.* at 1022. Here, by contrast, Hill's IQ is so low that the Warden concedes that Hill satisfies the first prong. Additionally, O'Neal's claim for *Atkins* relief also failed because his adaptive deficits may well have been better explained by his drug abuse and personality disorder rather than organic mental illness. *Id.* at 1022–23.

was not, at present, intellectually disabled. *See See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 781); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1050–51). *But see* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 211) (stating that a person with intellectual disability can still lie, manipulate, and cheat). Drs. Olley and Huntsman also emphasized the sophistication of Hill's crimes and his interactions with prison, law-enforcement, and court officials. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Pages 726–731, 737–50, 770–75, 779–82.); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1024–35, 1040–55). Dr. Hammer, on the other hand, based his diagnosis on all types of anecdotal evidence, including Hill's records from school, and concluded that Hill satisfied all three prongs for a diagnosis of intellectual disability. *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 383–84) ("My opinion is that [Hill] falls within the high end of the mild retardation range."); *id.* at 156; *see also id.* at 190 (describing mild intellectual disability as "significant" or "severe" impairment in the ability to function).

Dr. Olley (the state's expert) stated that Hill's memory was very good in court on April 15, 2004, when he provided details of events. R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 744). Dr. Olley also stated, based on an interview with Hill, that Hill was able "to express a complex explanation of the crime in order to support his claim of innocence." R. 97 [disc 1] (Suppl. App.) (Page 1125). Although Dr. Olley admitted that Hill's case was a "close call," R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 861), he nevertheless concluded that Hill's "way of presenting himself," both in his police interrogation and before the court, was inconsistent with an intellectual-disability diagnosis, *id.* at 718–19, 726–27. Dr. Olley said that he had never heard of an intellectually disabled inmate calling the media to arrange an interview, as Hill did in this case by reaching out to the *Tribune Chronicle*. *Id.* at 763. Dr. Olley noted that Hill was able to tell an elaborate "conspiracy" theory about the events leading to his capital trial for Fife's murder, which echoed a "very similar" soliloquy he made before the trial court on April 15, 2004. *Id.* at 770–72. Dr. Olley characterized this soliloquy as "long," "rambling," and ultimately implausible—but he testified that he was nonetheless "struck" by Hill's "sophisticated memory and reasoning." *Id.* at 771–72.

Dr. Huntsman (the trial court's expert)'s report similarly focused on Hill's "remarkable memory for the history of his case," his detailed and "very complex explanation for how Raymond Fife came to be killed," as well as the "competencies" observed by staff members in prison. R. 97 [disc 1] (Suppl. App.) (Page 1141). Dr. Huntsman described Hill's story as "bouncing around in time," and she initially "couldn't keep track of what [they] were talking about." R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1021, 1025). She characterized the conspiracy story as "remarkable and not likely, not very plausible." *Id.* Still, despite the story's apparent lack of "logic," Dr. Huntsman noted "the degree of organization, the degree of complexity[,] and the degree of memory that he displayed as [they] talked." *Id.* at 1025–26. She testified that it was not the story Hill told, but his "process of telling the story"—which demonstrated complexity, "sophistication," a noteworthy vocabulary, and a "general ability to communicate"—that led to her conclusion that he was not intellectually disabled. *Id.* at 1190.

In the end, Drs. Olley and Huntsman each opined that Hill was "borderline intellectual functioning" as defined in the DSM-IV. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 936); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1044); *id.* at 1049 (stating that "what makes me say that I believe that in my opinion he falls within the borderline range of intellectual functioning has to do with his adaptive behavior"). Dr. Olley described borderline intellectual functioning as "no mental retardation but it is the . . . functioning that is . . . between one standard deviation below the mean and two standard deviations below the mean," *i.e.*, an IQ range between "71 to 85." R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 936). Drs. Olley and Huntsman came to this conclusion even though people at the lower end of borderline intellectual functioning and the higher end of intellectual disability are "going to be quite similar . . . in some regards," R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 465), including in their ability to create a "script" involving various people and events, *id.* at 537–38.

In Dr. Hammer (Hill's expert)'s opinion, Hill's behavior was not inconsistent with that of a person with mild intellectual disability because those persons often attempt to don a "cloak of competence." *Id.* at 191–92. "[M]any people with mild [intellectual disability]," he explained, "are quite aware of their deficits in learning and functioning and are somewhat worried that other people will find that also. So they oftentimes will develop certain skill areas that they can hold

out as indicating that they have a competence in a certain area and, therefore, are trying to mask
. . . what their deficits actually are." *Id.* This frequently involves "learning sort of . . . scripts or
scenarios that they can kind of pull out." *Id.* at 192–93. The trial court, which adopted the
opinions of Drs. Olley and Huntsman, but made no reference to Dr. Hammer's cloak of
competence discussion in its opinion, apparently did not afford this concept much weight.

Drs. Olley and Huntsman also placed significant weight on the testimony of prison
officials about Hill's recent behavior in the prison environment. These officials considered Hill
"average" in intelligence compared to other death row inmates. "They testified that Hill
interacted with the other inmates, played games, maintained a prison job, kept a record of the
money in his commissary account, and obeyed prison rules." *Hill*, 2014 WL 2890416, at *39.
One official said that Hill was feigning intellectual disability for his *Atkins* claim, and another
said that Hill's hygiene was "poor but not terrible." *Id.* (quoting *Hill*, 894 N.E.2d at 125).

As the district court noted, all of the experts conceded that relying on Hill's behavior in
prison to assess adaptive skills is problematic because "death row is a segregated, highly
structured and regulated environment." *Hill*, 2014 WL 2890416, at *42.[9] Evidence of adaptive
functioning in this kind of controlled setting is of limited value because inmates do not have the
same opportunities to acquire new skills or show weaknesses in existing skills. Assessing Hill's
adaptive deficits as an adult is particularly challenging given the absence of any reliable testing
to measure Hill's adaptive functioning and the lack of reliable evidence of how Hill would have
functioned as an adult in general society as he has been incarcerated for all but six months of his
adult life. Given the lack of evidence regarding Hill's likely adaptive performance as an adult in
the general community, the experts should have considered all available evidence.

---

[9]The medical literature available in 2008 prohibited the assessment of adaptive skills in atypical
environments like prison. For example, the 2002 American Association on Mental Retardation says "[l]imitations in
present functioning must be considered within the context of community environments typical of the individual's
age peers and culture." AAMR-10, at 8. It continues: "This means that the standards against which the individual's
functioning must be measured are typical community-based environments, not environments that are isolated or
segregated by ability." *Id.*

Drs. Olley and Huntsman leaned heavily on these prison officials' testimony rather than treating them with the degree of skepticism that they deserved. As the district court noted, the weight of the testimony from various death-row prison officials was limited by their potential bias against the inmates they were charged with guarding, as well as the shortcomings affecting lay opinions about intellectual disability generally. *Id.* at *42–43. And many of the prison officials' statements were "rife with contradictions, with themselves and each other." *Id*. at *43.

These flaws might be forgivable under AEDPA deference, but there is one problem with Drs. Olley's and Huntsman's testimony that we cannot overlook: neither of them grappled with the extensive past evidence of Hill's intellectual disability. Both experts, instead, assessed Hill's adaptive skills "as they existed at the time of the hearing"—even though intellectual disability is a static condition. *Hill*, No. 4:96-cv-00795, 2014 WL 2890416, at *23; *see Hill*, 881 F.3d at 489, n.7 (citing *Hill*, 894 N.E.2d at 113); *Williams*, 792 F.3d at 617–19; R. 97 [disc 1] (Suppl. App.) (Page 1125) (Dr. Olley reporting that "[t]he available information on Mr. Hill's *current functioning* does not allow a diagnosis of mental retardation . . . .") (emphasis added). At the State's urging, the trial court ruled that it would focus the *Atkins* inquiry on Hill's current functioning, but noted that it would not preclude historical evidence from coming in. R. 97 [disc 1] (Suppl. App.) (Pages 175–81, 217–23, 247–50). As a result, the opinions of Drs. Olley and Huntsman, like the Ohio courts' own assessments, lack a credible foundation.

Dr. Olley recognized the importance of anecdotal evidence when he relied on testimony from prison guards to assess Hill's adaptive skills. But when it came to past anecdotal evidence of Hill's adaptive deficits, Dr. Olley dismissed it as evidence of low *academic* skills only. R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 783). Acknowledging that Hill's school teachers thought he was intellectually disabled, Dr. Olley said that he could not say the same because "[t]he information is simply not available." *Id.* That is simply not true.

As for Dr. Huntsman, she, too, did not give much thought to the past anecdotal evidence of Hill's adaptive deficits. She stated that she was retained to decide "whether [Hill] is *now* a mentally retarded individual." R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1052). When prompted for her opinion of Hill's school records, she stated that these records were not as reliable as the court-conducted tests because teachers' assessments "were being done for a very

different purpose." *Id.* at 1046.  Never mind that the Ohio Supreme Court had already decided in *White* that school records *are* relevant for an adaptive-deficits analysis.  *White*, 885 N.E.2d at 916.  Dr. Huntsman also threw out a guess that Hill had not tried his hardest in school.  R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1048).  Having disregarded much of the past anecdotal evidence, she stated that Hill "probably" was not intellectually disabled at the time of the offense.  *Id.* at 1052 ("I think that the only thing that I've said today that I didn't say previously in my report, because I wasn't asked to address it in my report, is that my opinion is that he was probably not retarded at the time of the offense.").

Even though Drs. Olley and Huntsman conceded that this was a close case, they made no real attempt to reconcile their outcome with Hill's past diagnoses of intellectual disability—and in fact, they were effectively told not to do so.

Rather than grapple with the extensive record of Hill's intellectual disability, the state trial court made its findings based on Hill's scattered and scripted conspiracy story of the Fife murder, his demeanor in interacting with law enforcement and the legal system, and the supposed sophistication of his crimes.  *State v. Hill*, No. 85-CR-317, at 73–77 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3477–78)].  Those "adaptive strengths" convinced the state trial court that Hill could not be intellectually disabled because he had "remarkable" communication and vocabulary skills and was self-directed.  *Id.* at 74.  As we previously stated, "there is substantial evidence in the record to contradict" these findings.  *See Hill*, 881 F.3d at 493.  But having set their gaze on Hill's interactions with prison, court, and police officials, Drs. Olley and Huntsman said next to nothing about the substantial evidence in the record both from his time in school and in prison that Hill was easily led, struggled to communicate, and struggled to read.  As we held in *Williams*, *Atkins* and *Lott* recognized that intellectual disability presents itself in childhood and is a permanent condition.  *See Williams*, 792 F.3d at 617–19.  Under *Atkins/Lott*, courts cannot limit their focus to contemporary accounts while discounting past evidence of intellectual disability.

### 3. Myths and Misrepresentations

To the extent that the Ohio courts addressed past evidence of Hill's adaptive deficits, they misconstrued it or tried to offset it with irrelevant facts. Rather than take this evidence seriously, the Ohio Court of Appeals adopted the trial court's analysis as consistent with its own perception of the record:

> *Public School Records*. Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

> *Hill's Trial for the Murder of Raymond Fife*. The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation. In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation. This last point was also noted by Dr. Olley in his hearing testimony: Hill "stood his ground during that interrogation very, very strongly. * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided. * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

> *Death Row Records*. At the time of the evidentiary hearing, Hill had been incarcerated on death row for 20 years. From this period of time, the trial court considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter Andrew Gray in the year 2000. These interviews were arranged on Hill's initiative in order to generate publicity for his case. The trial court found Hill's performance on these tapes demonstrated a high level of functional ability with respect to Hill's use of language and vocabulary, understanding of legal processes, ability to read and write, and ability to reason independently.

> The trial court considered the evidence of the various prison officials who testified at the evidentiary hearing. These witnesses consistently testified that Hill was an "average" prisoner with respect to his abilities in comparison with other death row inmates. They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules. Prison officials offered further testimony in their interviews with the expert psychologists. One official opined that Hill began to behave differently after *Atkins* was decided, and he believed

that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

  *Hill's Appearances in Court.* The trial court stated that it had "many opportunities" to observe Hill over an extended period of time and, as a lay observer, did not perceive anything about Hill's conduct or demeanor suggesting that he suffers from mental retardation.

*Hill*, 894 N.E.2d at 124–25.

We are troubled by these findings. To start with, the Ohio courts' finding "that Hill 'underachieved' academically or in any other adaptive skill as a child is," as the district court remarked, "squarely contradicted by the record." *Hill*, 2014 WL 2890416, at *26. The district court could not find, and neither can we, "one reference in Hill's school records by a teacher, school administrator, psychologist, psychiatrist, or anyone else suggesting that Hill was capable of performing at a substantially higher level but chose not to." *Id.* (footnote omitted). And as the experts in this case testified, evidence of behavioral problems or a conduct disorder simply does not undermine a simultaneous finding of intellectual disability. *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 612); R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 713) ("[I]f he's having conduct problems in school, that's neither here nor there to a diagnosis of mental retardation."); (Page R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1102–03). The state courts incorrectly discounted the fact that Hill was easily led because he committed crimes on his own. Under then prevailing medical standards, however, Hill's prior criminal behavior should not be given weight in this analysis.

The Ohio courts' focus on a note drafted by a teacher *in a school for intellectually disabled children* describing Hill as "'bright' and 'perceptive,' with 'high reasoning ability'" was, as the district court put it, "almost cynical in its selective misrepresentation of the facts." *Hill*, 2014 WL 2890416, at *27. In the same report, Hill's special education teacher noted that Hill, who was thirteen at the time, had the reading skills of a first-grader and the math skills of a third-grader. R. 97 [disc 1] (Suppl. App.) (Page 578). Her proposed goals for Hill were for him to shower regularly, eat and drink in a manner appropriate to school, blend letter sounds to say words altogether out loud, tell time in five-minute intervals, and count change up to $1.00. *Id.*

The Ohio courts' handling of evidence regarding self-care is equally troubling. The Ohio Court of Appeals's sole reference to Hill's deficits with regard to self-care was its summary of testimony provided by a prison official "that Hill's self-care was 'poor but not terrible' and that Hill had to be reminded sometimes about his hygiene." *Hill*, 894 N.E.2d at 125. Such a statement downplays the record's extensive chronicling of Hill's struggles with hygiene, including the fact that an individual education plan established for Hill when he was nearly fourteen years old included an "[a]nnual [g]oal and [o]bjective" of helping Hill "learn to shower when necessary" and to "put soiled clothing in the appropriate place." R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 281, 327).

The state trial court also unduly relied on Hill's "initiative in coming to the police" after Fife's death, as well as his alleged efforts to misdirect the investigation and fabricate an alibi while under interrogation, as "evidence of Hill's ability concerning self-direction and self-preservation." *See Hill*, 894 N.E.2d at 124. While conceding that there "are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone." *Id.* But Hill was not even a suspect before he went to the police, and his statements are what aroused their suspicion. Incriminating oneself is hardly self-preservation. And as the district court noted, "'[s]elf-preservation' is not [even] among the adaptive skills measured under the clinical definitions of intellectual disability." *Hill*, 2014 WL 2890416, at *33. And "self-direction" covers a host of behaviors—including "initiating activities appropriate to the setting" and "demonstrating appropriate assertiveness and self-advocacy skills"—that are either unrelated or directly contrary to Hill's decision to make contact with the police. *Id.*

Moreover, contrary to the Ohio courts' findings, Hill's "performance" during the police interrogation revealed him to be "childlike, confused, often irrational, and primarily self-defeating," and Hill's attempts to change his story under pressure failed to "skillfully hid[e] his part" in Fife's death. *Id.* at *34. The police even stated that Hill was suggestible, telling him that "Everytime [*sic*] we suggest something to you, you have a tendency to agree with us." R. 26 (Trial Tr. at 30) (Page ID #2105). Hill often changed his story or "embellished his statement[s] at the slightest suggestion by the police, even when the information at issue was irrelevant or

incriminating." *Hill*, 2014 WL 2890416, at *35.  These actions were "quite the opposite of adaptive." *Id.* at *34.  This is especially true where Hill's decision to approach the police did not "resolve his problems," but "succeeded only in immediately drawing the police's attention to himself." *Id.*

While purportedly relying on prison accounts, the Ohio courts made no mention of Hill's prison *records*.  Those records reflect that prison officials always understood Hill to be mentally incapacitated or "slow."  As when he was in school, Hill was considered to be illiterate in prison. He was understood to have a "very limited writing ability," and he had other inmates write for him.  R. 97 [disc 1] (*Atkins* Hr'g Tr.) (Page 438).  Notes written from Hill to prison officials make clear that he had trouble keeping track of his prison account balance.  According to fellow inmates, when Hill was given a task, he had to be carefully supervised because he could not remember how to complete the assigned task.  At least one prison official reported that Hill was able to perform his job as a porter because the cleaning supplies were sorted by color, so Hill was not required to read the supplies' instructions.  *Id.* at 363, 1381.

Rather than credit the ten intellectual-disability diagnoses that Hill received prior to *Atkins* even being decided, the court made its own lay judgment that "there is nothing about [Hill's] general appearance—facial expressions or conduct—suggesting . . . that the Petitioner is mentally retarded."  *State v. Hill*, No. 85-CR-317, at 76 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Page 3474)].  The Ohio Court of Appeals defended that lay judgment on the basis that the experts also believed that Hill failed to exhibit significant adaptive deficiencies.  *See Hill*, 894 N.E.2d at 125–26.

Perhaps most disturbing, three psychologists who testified at Hill's pre-*Atkins* mitigation hearing concluded that Hill was intellectually disabled and had extremely poor adaptive functioning.  On appeal, the Ohio Supreme Court and Court of Appeals found these psychologists' testimony credible and concluded that Hill was intellectually disabled.  *See State v. Hill,* 595 N.E.2d 884, 901 (Ohio 1992); *State v. Hill*, Nos. 3720, 2745, 1989 WL 142761, at ** 6, 32 (Ohio Ct. App. Nov. 27, 1989).  It was only after *Atkins* came down, and Hill was again assessed for intellectual disability in renewed state-court proceedings, that the Ohio courts reversed course.  *See Hill*, 300 F.3d at 682 (remanding this case to the Ohio courts so that Hill

could exhaust his *Atkins* claim, while recognizing that the "Ohio courts reviewing his case have [already] concluded that Danny Hill is retarded and voluminous expert testimony supported this conclusion" (citation omitted)).

### 4. Conclusion

The evidence that Hill is intellectually disabled is overwhelming. It is clear from the record that Hill was universally considered to be intellectually disabled and seriously lacking in adaptive skills by school teachers, administrators, and the juvenile court system, and even (previously) the Ohio Supreme Court. Hill consistently performed very poorly in school (functional academics); there was consistent documentation that he had trouble maintaining proper hygiene despite reminders (self-care); he had trouble making friends and responding appropriately to authority figures (social and communication); and he was described as a follower, easily led, and vulnerable to exploitation by adults (self-direction). The record shows that these deficits largely continued into adulthood, particularly with respect to self-care and functional academics. Nevertheless, the state courts and the experts they retained failed to grapple with this extensive social history, choosing instead to favor the accounts of prison guards and personal observations.

We hold that the Ohio courts' legal conclusions breach the most basic tenets of *Atkins*, and that their factual findings cannot be sustained on this record. *Atkins*, on its most basic level, forbids the execution of persons who are intellectually disabled. It requires courts to look at all relevant evidence of intellectual disability—and certainly evidence of manifestations before the age of 18. This is not a case where evidence of intellectual disability comes out after conviction. Hill was diagnosed as intellectually disabled from a very young age. He attended special education classes. He could not be counted on to bathe. Yet, the Ohio courts were impressed by his ability to incriminate himself to the police and to rehash a scripted story in a cloak of competency. They valued the opinions of prison guards interacting with Hill in a highly structured setting over professional reports and diagnoses recorded over a lifetime. Even if *Atkins* alone (without the assistance of *Moore*) poses no bar to offsetting adaptive deficiencies with adaptive strengths, "the Ohio courts failed to grapple with the evidence in the record indicating that Hill's perceived strengths were actually weaknesses." *Hill*, 881 F.3d at 495.

As the Ohio Court of Appeals itself stated at the penalty phase, "The record is replete with competent, credible evidence which states that [Hill] has a diminished mental capacity. He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills." *Hill*, 1989 WL 142761, at *32. There is no getting around it—Hill is intellectually disabled. To deny the obvious is unreasonable.

## B. Age of Onset

We also reject the state court's finding that Hill's intellectual and adaptive deficits did not manifest themselves prior to the age of eighteen because clear and convincing evidence suggests otherwise. *See* 28 U.S.C. § 2254(e)(1). In fact, as noted above, Hill's disability was extensively documented before he turned eighteen because he spent all of his school years in programs for the intellectually disabled and the juvenile justice system. The record is replete with comments from teachers concerning Hill's lagging academic performance, his poor memory, his lack of personal hygiene, his immature and inappropriate behavior in relation to his peers, and his tendencies as a follower. *Hill*, 894 N.E.2d at 128–29 (O'Toole, J., dissenting). In addition to school records, the state court record contains testimony to similar effect from several staff members at a halfway house in which Hill resided as a teenager, as well as a counselor at the juvenile correction facility where he was placed.

All the of these significant adaptive skill deficits manifested themselves before Fife was killed in 1985 and, as noted by the experts, there was no reason to suspect that Hill was malingering as a child despite his apparent malingering on the assessments administered in April 2004. The records cover the time frame from 1973 to 1984, six months before the murder for which Hill was sentenced to death, and twenty to thirty years before the Supreme Court decided *Atkins*. Hill could not have been faking intellectual disability to avoid the death penalty. Accordingly, we reverse the state courts' conclusion on the age-of-onset prong as it is contradicted by clear and convincing evidence.

We recognize, of course, that state court determinations of fact are entitled to a great deal of deference. But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief."

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Rather than address the abundant evidence in the record of Hill's adaptive deficits as a child and teenager, the state trial court focused on his ability to engage in "a one-man crime spree at the age of 17" and his ability to "hold his own during police interrogation of the Fife murder."  *State v. Hill*, No. 85-CR-317, at 82 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported).  In so doing, the trial court inappropriately focused on perceived adaptive strengths, ignored clinicians' warnings not to conflate criminal behavior with adaptive functioning, *see, e.g.*, R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 342–43), and failed to acknowledge that Hill's performance during the police interrogations was, in the words of the district court, "childlike, confused, often irrational, and primarily self-defeating."  *Hill*, 2014 WL 2890416, at *34.  In a three-sentence summary, the state appellate court affirmed the trial court's findings.  *Hill*, 894 N.E.2d at 126.  Such selective reliance on mostly irrelevant pieces of evidence to find that Hill lacked adaptive deficits before the age of 18 constitutes "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

Consequently, we conclude that the state court's finding that Hill's intellectual and adaptive deficits did not manifest before the age of eighteen amounts to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[10]  For all these reasons, the State of Ohio cannot constitutionally sentence Hill to death under *Atkins*.

### IV.  SUPPRESSION OF PRETRIAL STATEMENTS TO THE POLICE

For the convenience of the parties, this section and those that follow incorporate *in toto* Sections V through VII of our prior opinion.  *See* 881 F.3d 483 (6th Cir. 2018).

In addition to challenging his eligibility for the death penalty after *Atkins*, Hill raised several challenges to his conviction in his habeas petition.  Because we remanded his case to the state court after *Atkins* was decided in 2002, we did not reach the merits of those claims.  *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002).  We do so now and **AFFIRM** his conviction.

---

[10]As we have decided the merits of Hill's *Atkins* claim in his favor, we pretermit discussion of Hill's claim of ineffective assistance of counsel during his *Atkins* proceedings in state court.

Hill contends that the Ohio courts unreasonably applied clearly established federal law in determining that Hill's statements to police were admissible. Hill maintains that his statements were "involuntary and false" because: his intellectual disability made him especially vulnerable to police coercion; his intellectual deficiencies were known by the police, including interrogators Sergeant Thomas Stewart, Sergeant Dennis Steinbeck, and his physically abusive uncle, Detective Morris Hill; the police made statements to Hill that led him to believe that denying guilt was "hopeless"; and Hill lacked the intellectual capacity to understand the legal consequences of the statements he made (and the police recorded) while he was at the Warren police station.

Because the Ohio courts rejected this claim on the merits as part of Hill's direct appeal, *see Hill*, 595 N.E.2d at 890–91; *Hill*, 1989 WL 142761, at **5–8, Hill must show that the state courts' decisions involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). "[A]n unreasonable application of th[e Supreme Court's] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citation and quotation marks omitted).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "[a] suspect in custody must be advised . . .[,] 'prior to any questioning[,] that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting *Miranda*, 384 U.S. at 479). This holding was necessitated by the Supreme Court's acknowledgement that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson v. United States*, 530 U.S. 428, 434–35 (2000) (citation, quotation marks, and ellipses omitted). Thus, "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S.

298, 317 (1985); *see also Lego v. Twomey*, 404 U.S. 477, 487-88 (1972) ("[*Miranda*] excludes confessions flowing from custodial interrogations unless adequate warnings were administered and a waiver was obtained.").

In this case, it is undisputed that Hill was given *Miranda* warnings and signed a waiver prior to making the recorded statements that he sought to suppress at trial. Hill's challenge, then, is to the validity of that waiver. He argues that because his waiver was not knowing, intelligent, and voluntary, it was invalid.

A suspect may waive his *Miranda* rights only if "the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation and quotation marks omitted).

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation [reveals] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (citations and quotation marks omitted). For a waiver to be knowing and intelligent, the suspect must be "fully advised of [his] constitutional privilege[s]." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). To be voluntary, a confession may not be "the product of coercion, either physical or psychological." *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). However, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *see, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("[T]he [Supreme] Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily.") (citation omitted).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary . . . .'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Although a suspect's mental condition may be a "significant factor in the 'voluntariness' calculus," that "mental condition, by

itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'"[11]  *Id.* at 164.

On December 16, 1985, the Ohio state trial court held a hearing on Hill's motion to suppress his audio- and video-taped statements to the police.[12]  At the suppression hearing, witnesses testified to the following facts.

On September 12, 1985, two days after Fife was attacked, Hill went to the Warren Police Department and approached Sergeant Stewart to talk about that "boy being beat up in the field." R. 28 (Suppression Hr'g Tr.) (Page ID #2748–49).  Stewart, who was a friend of Detective Hill and had known (Danny) Hill since he was approximately six years old, agreed to talk to Hill in the "Narcotics Room."  *Id.* at 2750–51, 2782.  Stewart testified that Hill had come to the police station voluntarily, i.e., that no one had "brought him in," and Hill's testimony corroborated this assertion.  *Id.* at 2751; R. 29 (Suppression Hr'g Tr.) (Page ID #3130).

Once in the Narcotics Room, Hill told Stewart that he had seen another boy, Reecie Lowery, riding the bike of the boy "who was beat up."  R. 28 (Suppression Hr'g Tr.) (Page ID #2751–52).  When Stewart asked Hill, "How do you know it's the boy's bike?", Hill responded, "I know it is."  *Id.* at 2752.  Hill then told Stewart about the bike's location and encouraged Stewart to "go out and get the bike" before Lowery put it back in the wooded field where Fife was attacked.  *Id.*  After Hill told Stewart that he was willing to show him where the bike was located, Stewart and Hill began talking about various persons, including Tim Collins and Tim Combs (Hill's co-defendant).  Hill insinuated that both Collins and Combs liked boys and might have been the ones who attacked Fife.  At some point during their talk, Hill mentioned that Fife was choked with his underwear.  *Id.* at 2756–57.

---

[11]Under Supreme Court precedent, a person who meets the standard for intellectual disability may not be executed.  As discussed extensively above, we find that Hill is intellectually disabled and is entitled to have the writ issue with respect to his sentence.  However, the requirements for determining whether someone is intellectually disabled under *Atkins* and *Lott* are different from the requirements for determining whether a waiver is knowing and voluntary under *Miranda*.  And a person who is intellectually disabled may still be able to knowingly and voluntarily waive his *Miranda* rights.

[12]The transcript of the suppression hearing can be found in the district court record at R. 28 and R. 29 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997).  Because the pagination in the original transcript is unclear, we will cite to the pagination used by the district court.

Eventually, Stewart drove Hill to look for the bike, but because it was raining and visibility was poor, Stewart and Hill did not go to the wooded field. Instead, Hill showed Stewart where Combs lived. *Id*. at 2753–54. After dropping Hill off at his house, Stewart compiled a report that he shared with his fellow officers, including Sergeant Steinbeck. *Id*. at 2755, 2757–58.

The next day, September 13, 1985, Steinbeck went to Hill's home around 9:30 or 10:00 in the morning to follow-up on the information that Hill had given to Stewart. Steinbeck asked Hill to come talk to him at the police station and Hill agreed. *Id*. at 2762–63, 2881. Hill was driven to the police station in the front seat of Steinbeck's police cruiser and was not booked, fingerprinted, or placed under arrest. Steinbeck read Hill his *Miranda* rights aloud, asked Hill if he understood those rights, and had Hill sign a waiver of his *Miranda* rights before questioning Hill off and on for approximately three hours. *Id*. at 2863–64, 2882–84. During those three hours, Hill never asked for the questioning to stop, tried to leave, or asked to see an attorney. *Id*. at 2865–66, 2885–89. After talking to Hill, Steinbeck transcribed a copy of Hill's statement, which also included a recital of his *Miranda* rights. However, Hill did not sign the statement that day because Steinbeck had forgotten to ask him to do so after telling Hill he could go home with his mother. *Id*. at 2866–69, 2889–90.

On September 16, 1985, both Steinbeck and Detective Hill went to Hill's home, ostensibly to ask Hill to sign his statement from September 13 and to ask Hill's mother for a written statement regarding Hill's alleged alibi. After putting up some initial resistance to speaking to the police again, Hill, at the behest of his mother, agreed to come down to the police station, this time accompanied by his mother. Hill was not placed under arrest, booked, fingerprinted, or handcuffed. *Id*. at 2869–70, 2890–92, 2899–2901, 2930–32.

In the interrogation room, and apparently separated from his mother, Hill was verbally advised of his *Miranda* rights by Detective Hill. *Id*. at 2871, 2901–02, 2933. Hill indicated that he understood his rights. *Id*. at 2902. Although not initially present, Sergeant Stewart eventually encountered Sergeant Steinbeck and Detective Hill in the interrogation room with (Danny) Hill. *Id*. at 2758, 2872, 2908. At some point, officers told Hill they did not believe he was telling the truth, and Stewart told Hill that he needed to be honest if he had "anything to do with [Fife's

murder]." *Id*. at 2872, 2909–10.  Officers also told Hill that it would "benefit him" to tell them the truth, believing that Combs would likely blame the attack on Hill alone.  *Id*. at 2909.

Apparently at Hill's request, Detective Hill was left alone with his nephew.  According to (Danny) Hill, while he and Detective Hill were alone, Detective Hill "threw [him] against the wall," slapped him across the face, and told him that he "better tell" the police what happened. *Id*. at 2759, 2810–11, 2859, 2910, 2936–37, 2953.  Hill also testified that his uncle kicked him under the table in order to prompt Hill to (1) consent to his statement being taped and (2) begin talking to police at the beginning of the taping.

Detective Hill, unsurprisingly, described the time he spent alone with his nephew very differently, testifying:

> At that point in time, you know, I set [sic] there, and I tried to let Danny know that wasn't anyone [sic] going to hurt him.  No one was going to do anything to him, but [I also told him] the fact that I kn[e]w that he was involved in the homicide, and I wanted to get the truth out of him.  At that point in time, he looked at me and tears started to come from his eyes.  When tears started coming from his eyes, he told me . . . , "I was there.  I was in the field when he got murdered."  When the young Fife kid got murdered.**[13]**

R. 28 (Suppression Hr'g Tr.) (Page ID #2937).  When Detective Hill emerged from the interrogation room a few minutes later, he told the other officers that Hill was going to cooperate and tell them what happened.  At the time Detective Hill made this announcement, Hill was either crying or had tears in his eyes.  *Id*. at 2759, 2811, 2839, 2873, 2937–38.

At Stewart's suggestion, Hill gave the police permission to tape his statement.  *Id*. at 2759–60, 2873–76, 2912.  Sergeant Steinbeck, Sergeant Stewart, and Detective Hill were all present when Hill gave this initial audiotaped statement, as well as when Hill gave a second statement that was videotaped by Detective James Teeple.  *Id*. at 2874–75.  According to Stewart, Hill was not crying during the taped statement itself.  About halfway through the audio-taping, the police asked Hill to sign the statement he had given to Steinbeck on September 13. *Id*. at 2903.  Hill was also read his *Miranda* rights once more at some point prior to giving the second, videotaped statement.  *Id*. at 2876, 2923, 2963–64.  While giving his statements, Hill

---

**[13]**Detective Hill also denied kicking his nephew.

never asked to stop the interrogation, requested an attorney, or asked to leave. Sometime after the interrogation, Hill was placed under arrest based on the details included in his statements. *Id.* at 2776.

When asked questions about the nature of the interrogation generally, both Detective Hill and Sergeant Stewart denied that the police threatened or made promises to Hill during the interrogation, and asserted that Hill never asked for a lawyer. *Id.* at 2760, 2772, 2935, 2938. When prompted by the prosecutor about Hill's previous encounters with the police, Detective Hill estimated that by the date of the September 16, 1985 interrogation, Hill had been arrested by the Warren Police Department "[a]pproximately 15 to 20 times." *Id.* at 2929. Both Detective Hill and Sergeant Steinbeck testified that they had arrested Hill on prior occasions and had read him his *Miranda* rights "[m]any times." *Id.* at 2876, 2928–29. And two of the prosecution's exhibits at the suppression hearing included a waiver form and voluntary statement—both of which included a recitation of *Miranda* rights—signed by Hill on March 6, 1984, which was approximately a year-and-a-half before the September 16, 1985 interrogation.

In adjudicating this claim, the state appellate court rejected Hill's argument that his waiver of his *Miranda* rights was invalid. *Hill*, 1989 WL 142761, at *5. Acknowledging that it needed to make "discrete inquiries" as to both the "knowing and intelligent" and "voluntary" aspects of Hill's waiver, the appellate court considered these criteria in turn.

With regard to the knowing and intelligent factor, the appellate court noted that although the "lack of mental acuity . . . can interfere with an accused's ability to give a knowing and intelligent waiver," there is no bright line rule for distinguishing between "those capable of an intelligent waiver from those who lack the ability to do so." *Id.* The appellate court also acknowledged the Supreme Court's admonition in *Connelly* that a suspect's mental condition, by itself, does not necessarily prevent him from effectively waiving his *Miranda* rights. *Id.* In analyzing the facts of Hill's case specifically, the appellate court opined:

> [Hill] admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concomitant difficulties in language comprehension throughout his formal education. [Hill] is categorized as being mildly to moderately retarded. Evidence was presented which indicates that appellant is illiterate and this court

acknowledges that literal recognition of each word contained in the "*Miranda* Rights" and/or "waiver form" may be beyond [Hill's] mental comprehensive capacity.

However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multi-faceted exposure [Hill] has had with the state's criminal justice system. The evidential table in this case also demonstrates that [Hill] exhibited a functional capacity to understand these rights, including the right to appointed counsel. This was evident from the exchange that occurred during the audio and video tape sessions. The officers who interrogated [Hill] had either significant contact with him and/or had questioned him on prior occasions and had developed informed estimates as to [Hill's] ability to understand, albeit in a vernacular sense, all aspects of the *Miranda* warning. The audio and video tapes of [Hill's] interrogations disclose that [Hill] was capable of understanding the questions put to him and of responding intelligently.

Moreover, the behavior of the [Hill] during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. [Hill] possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, [Hill] qualified and corrected the police officers' misstatements of the factual scenario which he had related to them. He also was able to follow "verbal concepting," displaying an understanding of the officers' direction of questioning and the dialogue utilized during the interrogation.

*Hill*, 1989 WL 142761, at *6. Based on the aforementioned concerns, and citing the Supreme Court's decisions in *Miranda* and *Lego* in support, the state appellate concluded that Hill's waiver was knowing and intelligent. *Id.*

In addressing voluntariness, the appellate court rejected Hill's argument that his waiver was involuntary "as a result of his mental [infirmities] and the coercive action of the police." *Id.* First, the court noted that Hill's IQ was not necessarily dispositive as to whether he was incapable of voluntarily waiving his *Miranda* rights, particularly since he had been read those rights in his many prior encounters with police. *Id.* at **6–7. In addressing Hill's argument that his intellectual deficiencies made him vulnerable to the police officers' "psychological ploys," the appellate court noted that Hill was read his *Miranda* rights multiple times on September 13 and 16, 1985, and "appeared articulate and coherent as he answered questions." *Id.* at *8. Finally, in concluding that the record was "devoid of evidence indicating that the custodial interrogation of [Hill] violated his constitutional rights," the appellate court reasoned that

because (among other things):  (1) Hill originally approached the police on September 12 of his own accord; (2) Hill was read his *Miranda* rights numerous times without ever being placed under arrest; and (3) "[t]he recorded conversations [between Hill and the police] d[id] not suggest the use of any improprieties by the police," Hill's *Miranda* claim was without merit.  *Id.* at **9–10.

The Ohio Supreme Court ruled similarly, stating:  "Upon a careful review of the record, we can discern no coercive or overreaching tactics employed by the police during questioning." *Hill*, 595 N.E.2d at 890.  In making this finding, the court explicitly acknowledged that before Hill turned 18, Detective Hill "would at times physically discipline [his nephew] at the request of [Hill's] mother."[14]  *Id.*  In fact, the court appeared to credit Detective Hill's version of events— i.e., that "[Hill] stated to [Detective] Hill that he was 'in the field behind Valu King when the young Fife boy got murdered.'"  *Id.*  The court also found, based on the Supreme Court's ruling in *Connelly* and Hill's "his prior dealings with the criminal process as a juvenile," that Hill's "mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights."  *Id.*  Finally, the Ohio Supreme Court rejected Hill's contention that his waiver was rendered involuntary by virtue of the police's tactics during the interrogation.  *Id.* at 891 ("Upon a careful review of the testimony and the audiotape and videotape statements, we do not find that the interrogation tactics used by the police officers, even in light of [Hill's] mental capacity, rendered the statements involuntary, or that the officers improperly induced [Hill] to make incriminating statements.").

Reviewing the state courts' decisions under § 2254(d)(1), the district court found that Hill's arguments that he should be granted habeas relief on this claim were without merit.  *Hill v. Anderson*, No. 4:96-cv-00795, 1999 U.S. Dist. LEXIS 23332, at **78–92 (N. D. Ohio Sept. 29, 1999).

---

[14]Hill was 18 at the time of the September 16, 1985 interrogation, and Detective Hill testified at the suppression hearing that he had not physically disciplined his nephew since at least six to eight months prior.  R. 28 (Suppression Hr'g Tr.) (Page ID #2976).

Applying AEDPA's deferential review standard, we ask whether the state courts unreasonably applied Supreme Court precedent in finding that Hill's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.  *See* 28 U.S.C. § 2254(d)(1).  *Connelly* tells us that a compromised mental state does not, "by itself and apart from its relation to official coercion," vitiate a defendant's ability to waive his *Miranda* protections.  *See* 479 U.S. at 164. And *Miller v. Fenton*, 474 U.S. 104 (1985), directs us to treat state-court findings on "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings" as "conclusive" on habeas review if they are "fairly supported in the record."  *Id.* at 117.

In light of these admonitions, the state courts' conclusion that Hill effectively waived his *Miranda* rights was not "unreasonable" as that term has been defined by the Supreme Court. The state courts could plausibly credit Detective Hill's account of his interrogation techniques over Hill's allegations of physical abuse to find a lack of undue coercion and could point to Hill's prior experiences with the criminal justice system and the *Miranda* process as evidence that Hill understood the nature of his waiver.

Although the required deference to the state courts' finding compels our holding on this issue, we wish to express our consternation with this result.  The record contains ample evidence demonstrating that Hill's waiver was neither voluntary nor knowing.  Hill was interrogated, in private, by a police-officer uncle who admitted to disciplining Hill physically in the past, and who allegedly "'threw [Hill] against the wall,' slapped him across the face, and told him that he 'better tell' the police what happened" during the course of the interrogation.  *Supra* p. 34.  Hill's uncle then purportedly kicked Hill under the table to induce his consent to a videotaped confession and kicked Hill again when he was reluctant to begin the confession.  When considered alongside Hill's intellectual disabilities, Detective Hill's behavior raises grave questions about the voluntariness of Hill's waiver.

And while Hill was certainly exposed several times to *Miranda* warnings, we are not convinced that he ever registered the warnings' meaning. During the suppression hearing the state trial court held in 1985, Hill's attorney asked Hill a number of basic questions about his understanding of *Miranda*:

> Q:     [W]hat are your Constitutional Rights?
> A:     I don't know.
> Q:     What's the word constitution mean?
> A:     I don't know.
> Q:     What's the word appointed—
> A:     When you point at somebody.
> Q:     You point at somebody?
> A:     Yeah.
> . . . .
> Q:     When the police talked to you, did you go ahead and talk to them?
> A:     Yes.
> Q:     Why?
> A:     They police. [sic]  You're supposed to talk to them.
> Q:     You have to talk to them?
> A:     Yep!
> Q:     Do you know what's an attorney? [sic]
> A:     I don't know.

R. 29 (Suppression Hr'g Tr.) (Page ID #3114–16).

It is difficult, in light of this testimony, to accept the state courts' determination that Hill "exhibited a functional capacity to understand [his] rights."  *Hill*, 1989 WL 142761, at *6. Nevertheless, because of the procedural posture of this case, we are compelled to affirm the district court.

Accordingly, we **AFFIRM** the district court's denial of habeas relief as to his suppression claim.

# V.  INFLAMMATORY STATEMENTS
## BY THE PROSECUTOR DURING HILL'S BENCH TRIAL

Hill also makes a prosecutorial misconduct claim based on the prosecutor's allegedly inflammatory statements to the three-judge panel that convicted Hill and sentenced him to death.

This claim is governed by § 2254(d)(1).  As indicated above, Hill must show that the state court's decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

The full-text of the "inflammatory statements" challenged by Hill may be found in his opening brief.  Some of those comments included:

- A reference to Raymond Fife being a 12-year-old boy from the community who had a "right to live," a right to "be in school," and a right "to be here today";

- Statements that Hill was an "animal," who "destroyed and devoured" Fife, and "would make the Marquis de Sade proud";

- A statement that "you don't necessarily have fingerprints on everything" with reference to the apparent lack of Fife's fingerprints on his bike;

- The prosecutor's opinion about which expert witness on a particular issue was "more qualified";

- A statement that Detective Hill did not want to testify against his nephew;

- A reference to Hill being a "poor, dumb boy" who nonetheless violently raped two women and therefore "relishe[d] . . . inflicting pain and torture [on] other human beings";

- A statement that Hill put Fife through a "living hell," that Fife "had no justice while was living," and that justice demanded a guilty verdict;

- The prosecutor's opinion that defense counsel had not shown "any mitigating factors" and that the aggravated factors "clearly outweigh[ed] the absence of any mitigation";

- Two more references to Hill's history of sexual assault, which the prosecution argued belied the idea that Hill had "difficulty with his motors skills";

- A rambling soliloquy about how the prosecution would have liked to called Fife as a witness so he could describe the beating, strangulation, and sexual assault he endured, but Fife was "not here to testify about that thanks to [Hill]."  The prosecutor also stated that Fife, if alive, would have testified about how he missed his family and his friends;

- A reference to Hill as "this manifestation of evil, this anomaly to mankind, this disgrace to mankind."

In adjudicating this claim as part of Hill's direct appeal, the Ohio Supreme Court (1) noted that trial counsel never objected to any of the "complained-of comments," (2) opined that those comments were therefore subject to plain error review only, and (3) concluded that the prosecutor's statements amount to "neither prejudicial error nor plain error[.]" *Hill*, 595 N.E.2d at 898. The Ohio Supreme Court also noted that in Ohio, "[courts] indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Hill*, 595 N.E.2d at 898 (quoting *State v. White*, 239 N.E.2d 65, 70 (1968)).

The district court rejected Hill's prosecutorial misconduct claim as well, reasoning that:

> [Hill's] case was tried before a three judge panel [that] presumably was able to remember the evidence presented at trial and not be misled by any of the prosecutor's statements. Most of the statements were harmless . . . . Three judges should have been able to disregard any intended undue influence.[15]

1999 U.S. Dist. LEXIS 23332, at *110. Accordingly, the district court concluded that the Ohio Supreme Court's determination that "no prejudicial or plain error occurred . . . was not an unreasonable application of clearly established law." *Id.* at **110–11.

In assessing whether the Ohio Supreme Court's decision involved an unreasonable application of federal law, the relevant Supreme Court holding is the Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), which held that "a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 576 U.S. 37, 45 (2012) (quoting *Darden*, 477 U.S. at 181). The Supreme Court has also held that "the *Darden* standard is a very general one, leaving courts 'more leeway in reaching outcomes in case-by-case determinations.'" *Id.* at 48 (citation, quotation marks, and ellipses omitted).

---

[15]The state appellate court, in adjudicating this claim, similarly noted that although some of the prosecutor's comments would have "perhaps [been] prejudicially erroneous in a jury trial, [that] was not so [in Hill's case]." *Hill*, 1989 WL 142761, at *15.

In *Darden*, the Supreme Court found that comments similar to some of those made by the prosecutor in this case—particularly allusions to the death penalty and the defendant being an "animal"—were improper.  477 U.S. at 179–80.  Those comments, unlike the comments in this case, were made before a jury, not a three-judge panel.  *Id.* at 170–71.  Nonetheless, the Supreme Court noted that these improper statements did not "manipulate or misstate the evidence, [or] implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  *Id.* at 182.

In this case, it is clear that the prosecutor's comments were emotionally charged and designed to paint Hill in a bad light.  However, it does not appear that they misstated the evidence in the case or implicated Hill's constitutional rights.  Further, any efforts to play on the emotions of the three-judge panel would likely have been futile.  Although they may not adopt a presumption as strong as the one "indulged" by the Ohio courts, federal courts similarly presume that a judge, as the trier of fact, can readily identify credible evidence, *United States v. Thomas*, 669 F.3d 421, 425 (4th Cir. 2012), give proper weight to the evidence, *Caban v. United States*, 728 F.2d 68, 75 (2d Cir. 1984), and understand what law is relevant to his or her deliberations, *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986).  And Hill has put forth no evidence indicating that the three-judge panel that tried his case was incapable of discerning what constitutes admissible evidence and parsing such evidence out from any inflammatory or irrelevant[16] comments by the prosecutor.[17]  For these reasons, we conclude that the decision by the Ohio Supreme Court was not an unreasonable application of clearly established law.

We **AFFIRM** the district court's denial of habeas relief as to Hill's prosecutorial misconduct claim.

---

[16]For example, the three-judge panel disclaimed any reliance on Hill's "prior crimes . . . in reaching its verdict."  *See Hill*, 595 N.E.2d at 893.

[17]Hill's reference to a single line in the panel's opinion that referred to Hill and Combs' "blood lust characterized by a series of acts of torture, rape, and murder," does not change this conclusion.  The rest of the opinion describes Fife's injuries, and the means by which they were inflicted (based on the evidence at trial), in great detail.  The opinion also indicates that the judges were struck by the "total lack of remorse" shown by Hill appearing at the police station to seek a reward after Fife's death.  Looking at the document as a whole, there is no indication that the comment with which Hill takes issue was derived from the prosecutor's statements rather than the judges' own assessments of the offenses.

## VI. THE TRIAL COURT'S FAILURE
## TO HOLD A PRETRIAL COMPETENCY HEARING

Lastly, Hill argues that the trial court's failure to inquire about Hill's competency denied him a fair trial under the due process clause of the Fourteenth Amendment. Here, the term "trial court" refers to the court that tried Hill's underlying offenses in 1985 and 1986.

This claim is governed by § 2254(d)(1). As indicated above, the Supreme Court has held that to obtain relief under § 2254(d)(1), the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In assessing competence, the relevant question is whether the defendant's "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). If the defendant's mental condition meets this description, the courts may not try him.[18] *Id.*

Hill maintains that because the trial court knew that he had "limitations in vocabulary, ability to calculate, and ability to draw" and "could not recognize or understand a majority of the words on the *Miranda* waiver form," the trial court should have "conduct[ed] further inquiry into [Hill's] competency to stand trial." Hill's Br. at 124–25. With regard to this final issue, Hill requests that this Court determine "not whether the state court was unreasonable in finding Danny competent to stand trial, but whether it was unreasonable under *Pate*[19] and *Drope*[20] not to make such an inquiry in the first instance." *Id.* at 124. Hill also argues, with no elaboration and

---

[18]Again, our conclusion that Hill is intellectually disabled and thus ineligible for execution under *Atkins* does not mean that Hill was incompetent to stand trial or that the trial court should have presumed his incompetence and ordered a competency hearing *sua sponte*. The two inquiries are different, and even *Atkins* recognizes that "[m]entally retarded persons frequently . . . are competent to stand trial." 536 U.S. at 318.

[19]*Pate v. Robinson*, 383 U.S. 375 (1966).

[20]*Drope v. Missouri*, 420 U.S. 162 (1975).

minimal citation to the record,[21] that the Ohio Supreme Court "unreasonably applied *Pate* and *Drope*" in determining that Hill was competent to stand trial. *Id*. at 125.

The Warden, for his part, asserts that "[a]lthough Hill is intellectually limited, his demeanor at trial was such that the trial court had no reason to *sua sponte* assess Hill for competence to stand [trial]." The Warden also argues that:

> The trial record gives every indication that Hill was compliant, cooperative and appropriately attentive to the proceedings. Moreover, the trial judge had ample opportunity to assess Hill's ability to navigate through the trial proceedings, where Hill testified extensively during a pre-trial suppression hearing, and also had a direct colloquy with the trial court for acceptance of the jury waiver. In addition, none of the three mental health experts who testified for the defense at trial expressed a concern about Hill's competence to stand trial.

Warden's Br. at 97. Hill's reply brief does not address these contentions.

Neither the state appellate court nor the Ohio Supreme Court opinions from Hill's direct appeal noted Hill's competency argument as one of his nineteen assignments of error and twenty-five propositions of law, respectively. *See generally State v. Hill*, 595 N.E.2d 884 (Ohio 1992); *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989). Instead, the only similar claims addressed by these courts pertained to Hill's arguments that he could not knowingly and voluntarily waive his right to counsel or his right to a jury trial due to his alleged intellectual disability. *See, e.g.*, *Hill*, 595 N.E.2d at 890–91, 895; *Hill*, 1989 WL 142761, at **3, 5–7, 13–14. The district court found that Hill raised the issue of competency only under state law, not federal law, and that Hill did not raise the competency claim under federal law until filing for state post-conviction relief. *Hill*, 1999 U.S. Dist. LEXIS 23332, at **92–93. On this basis, the district court concluded that Hill's competency claim was procedurally defaulted. *Id*. at **93–94 (citing *State v. Hill*, No. 94-T-5116, 1995 WL 418683 (Ohio Ct. App. June 16, 1995)). The Warden argues that even if Hill's claim was not procedurally defaulted, it fails on the merits. We agree.

---

[21]This issue occupies three pages in Hill's opening brief and just over a page in his reply brief. The only record citation in the opening brief seeks to demonstrate that Hill "could not recognize or understand a majority of the words on the *Miranda* waiver form."

On December 16, 1985, the trial court held a hearing on Hill's motion to suppress his statements to the police. Defense counsel called Hill as a witness to testify with respect to "the circumstances under which [he] gave statements to the police department." R. 29 (Suppression Hr'g Tr.) (Page ID #3101). In response to the trial court's questions, Hill indicated that he understood the purpose and nature of the hearing. *Id.* at 3103–04. He went on to testify about the means by which he arrived at the police station, as well as his inability to leave police custody prior to the arrival of his mother on Friday, September 13, 1985. On Monday, September 16, 1984, Hill returned to the police station at his mother's behest with his uncle, Detective Hill, and another police officer, Sergeant Steinbeck. As discussed earlier, Hill testified that while he and Detective Hill were alone, Detective Hill threw Hill against the wall, slapped him, and told him to tell the police what had happened. Hill also claimed that after being physically abused by his uncle, he told the police what they wanted to hear because he was afraid of both Detective Hill and the other officers. *Id.* at 3114, 3118–19.

Defense counsel, for his part, attempted to demonstrate that Hill could neither read nor write and that Hill signed the *Miranda* waiver without understanding its contents or knowing what it meant; meanwhile, the prosecutor attempted to demonstrate that Hill had been to the Warren police department many times before based on theft-related crimes and was therefore familiar with the department's *Miranda* form. *Id.* at 3107–09, 3115, 3121–23, 3152–53, 3155. On cross-examination, Hill testified that he signed the *Miranda* waiver because the police told him to do so. *Id.* at 3135–37. Hill's testimony ended following questions from the trial court about Hill's alleged physical abuse at the hands of Detective Hill.

Hill appeared before the trial court once more on January 7, 1986, this time to waive his right to a jury trial. *See Hill*, 595 N.E.2d at 889. The trial court's colloquy with Hill, which was designed to determine whether Hill's waiver was knowing and voluntary, included an explanation of the jury selection system, the role of the jury, the jury waiver's effect on some of Hill's pending motions, defense counsel's possible motives for seeking to waive Hill's right to a jury trial, and the differences between a jury and three-judge panel in terms of number of persons, familiarity with the law and the facts of the case, and demographic composition. The trial court read the waiver aloud to Hill and suggested the Hill go over the waiver with his

attorney.  Waiver of Jury Trial Hr'g Tr. at 10–11.[22]  Hill indicated that he had discussed the issue of waiver with both his attorney and his mother, and there was a 25-minute recess in which the attorney and Hill's mother apparently discussed the waiver with him further.  *Id*. at 5–6.  After the recess, Hill affirmatively stated that he wanted to be tried by the three-judge panel.  *Id*. at 12.

A review of Hill's testimony during the December 16, 1985, suppression hearing reveals that Hill claimed to understand the nature of the hearing and was able to answer questions posed by the prosecutor, defense counsel, and the trial court.  Hill stated more than once when he did not understand or did not know the answer to a question, either on his own or with attorney prompting.  He also appeared to understand the role of the trial judge.  Hill's interactions with the trial court at the January 7, 1986 hearing on his waiver of jury trial also failed to raise any red flags regarding competence.  Although the trial court did most of the talking, Hill did not express any confusion about the nature of the waiver, and was given an opportunity to go over the considerations discussed by the trial court with his attorney and mother before and during the hearing.  After Hill conferred with his attorney, the following exchange took place:

> COURT:  All right.  Danny, you've been talking with your lawyer now, have you not, for the last 25 minutes or so?
>
> DEFENDANT HILL:  Yeah.
>
> COURT:  And did he go over this matter of a jury trial with you?
>
> DEFENDANT HILL:  Yeah.
>
> COURT:  And you want to tell me now what decision you've made after talking this over.
>
> DEFENDANT HILL:  I want to have—
>
> COURT:  What do you want to do?  Who do you want to try it?  Three judges—
>
> DEFENDANT HILL:  Three judges.
>
> COURT:  —or do you want the jury?
>
> DEFENDANT HILL:  You.
>
> COURT:  I hope you understand—you mean myself and two other judges?
>
> DEFENDANT HILL:  (Nods head affirmatively.)

---

[22]The transcript of the jury waiver hearing can be found in the district court record at R. 30 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28. 1997).

*Id*. At no point during the hearing did Hill behave in a manner, or make a statement indicating, that he did not understand the nature of the waiver.

On this record, there is no indication that Hill did not understand the nature of the proceedings against him or that he could not consult with defense counsel to assist in his case. *See Edwards*, 554 U.S. at 170. Although Hill is correct that the record suggests that he was functionally illiterate at the time of the suppression hearing, Hill cites no authority for the proposition that trial courts should equate illiteracy to incompetence. He also cites no authority for the proposition that because there were other signs that he was intellectually limited, i.e., his limited vocabulary or "ability to draw similarities," the trial court should have doubted his competence to stand trial and ordered a competency hearing *sua sponte*. As indicated above, the trial court had at least two opportunities to observe Hill and interact with him directly, and these incidents did not suggest that Hill was incompetent to stand trial under *Pate*, *Drope*, or the more recent Supreme Court case, *Edwards*.

For the aforementioned reasons, we **AFFIRM** the district court's denial of habeas relief as to Hill's due process claim.

## VII.  CONCLUSION

For the reasons articulated above, we **REVERSE** the district court's denial of habeas relief with regard to Hill's *Atkins* claim and we **REMAND** with instructions to grant the petition and to issue the writ of habeas corpus with respect to Hill's death sentence. We pretermit Hill's ineffective assistance of counsel claim based on *Atkins*, and **AFFIRM** the district court's denial of habeas relief with regard to his other three claims.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 99-4317/14-3718

DANNY HILL,

     Petitioner - Appellant,

    v.

CARL ANDERSON, Warden,

     Respondent - Appellee.

> **FILED**
> May 20, 2020
> DEBORAH S. HUNT, Clerk

Before:  MERRITT, MOORE, and CLAY, Circuit Judges.

# JUDGMENT

On Remand from the Supreme Court of the United States.


    UPON CONSIDERATION of the Supreme Court's January 8, 2019 opinion and the supplemental briefs and arguments of counsel, and

    UPON RECONSIDERATION of this court's opinion of February 2, 2018,

    IT IS AGAIN ORDERED that the district court's denial of habeas relief with regard to Danny Hill's *Atkins* claim is REVERSED, and the case is REMANDED with instructions to grant the petition and to issue the writ of habeas corpus with respect to his death sentence.  We pretermit Hill's ineffective assistance of counsel claim based on *Atkins*, and AFFIRM the district court's denial of habeas relief with regard to his other three claims.

               **ENTERED BY ORDER OF THE COURT**

               Deborah S. Hunt, Clerk